FOSTER LUMBER COMPANY v. ATCHISON, TO-PEKA & SANTA FE RAILWAY COMPANY et al., Appellants.

Division Two, April 10, 1917.

1. **INTERSTATE SHIPMENTS:** Governed By U. S. Laws. The liability of a common carrier upon contracts concerning interstate shipments is governed by the Interstate Commerce Act and amendments thereto; and the construction of that act by the Federal courts is conclusive upon State courts.

2. ————: Bonus or Refund on Interstate Shipments for Increase in Business. A contract between a lumber company, about to locate large mills, and a railroad company desiring to have them located upon its lines in order that it might receive the manufactured lumber for shipment and the increase in traffic which would result from the building up of a new town, by which the railroad company agreed

in consideration of the erection of the mills at a designated point on its lines, to give to the lumber company an amount equal to half of the freight charges received by the railroad on interstate shipments of machinery and materials that went into the construction of the plant, was in violation of the Interstate Commerce Act, even prior to the amendment of 1906, whether said amount to be given or paid be considered a bonus graduated on the amount of shipments done, or a refund or drawback on rates paid, or reduced rates.

3. ———: ———: **Other Inducements: Promotion of Public Enterprises: Device.** The contention that the giving to a lumber company an amount of money equal to one half the freight charges received on all materials that went into the construction of its big mills in consideration of its location of its plant along the line of defendant's railroad, was not a rebate or drawback in freight rates, but merely the promotion of a public enterprise which would redound to the prosperity of the railroad, namely, the aiding in building up a town which would grow in public importance, with consequent demands for increased freight and passenger transportation, cannot be sustained, because the Interstate Commerce Act prohibits any device or indirect method of enforcing higher charges against one shipper than another, and has for its chief design the prevention of any discrimination among shippers that, by reason of rebates or draw-backs and the advantages derived from them, will enable large dealers to crush out or cripple smaller competitors who have no such advantages; and a bonus to a favored shipper is a discriminatory device.

4. ———: **Evidence: Established Rates.** A stipulation in the agreed statement of facts that the rates charged and paid by the shipper were the "regular, published tariff rates" is evidence that the rate the shipper paid was the "legally established and published rate" and sufficient in an action arising on account of a discrimination in violation of the Interstate Commerce Act, although there was no evidence that the rates were filed with the Interstate Commerce Commission and posted.

Appeal from Jackson Circuit Court.—*Hon. W. A. Thomas,* Judge.

REVERSED.

*Thomas R. Morrow, Cyrus Crane, George J. Mersereau* and *John H. Lathrop* for appellants.

(1) The alleged agreement or arrangement by which the railway companies were to pay to the lumber company

one-half of their proportion of the interstate freight charges on the shipments in question, constitutes one of the devices prohibited by the Interstate Commerce Act, and by reason thereof, the claim herein sued upon is void, illegal and unenforcible, and plaintiff cannot, therefore, recover in this case. Intertsate Commerce Act, Act of Congress, February 4, 1887 (24 Stat. L. 379), as amended by Act of March 4, 1889 (25 Stat. L. 855), and Elkins Act, Act of February 14, 1903 (32 Stat. L. 847), and Hepburn Act, Act of June 29, 1906 (34 Stat. L. 584); United States v. Union Stock Yards, 226 U. S. 286; Fourche River Lbr. Co. v. Bryant Lbr. Co., 230 U. S. 316; Railroad v. Goodridge, 149 U. S. 680; Railroad v. Interstate Commerce Comm., 200 U. S. 361; White v. United States, 167 U. S. 512; Packing Co. v. United States, 209 U. S. 56; Railroad v. United States, 212 U. S. 481; Railroad v. United States, 212 U. S. 500; Railroad v. Commission Co., 223 U. S. 573; Int. Com. Com. v. Railroad, 225 U. S. 326; Railroad v. Lumber Co., 174 Fed. 107; Railroad v. United States, 162 Fed. 835. (2) Since the passage of the Interstate Commerce Act, Congress has taken complete charge of the fixing of rates and the other terms upon which persons and property may be transported in interstate commerce. It has also fixed penalties for the violation of the Interstate Commerce Act and its amendments. The construction to be given these acts is determined by the United States Supreme Court and other Federal Courts, and such decisions are binding upon all State tribunals. Donovan v. Wells Fargo, 265 Mo. 291; Haseltine v. Bank, 155 Mo. 74; Briggs v. Holmstrong, 72 Mo. 337; Asphalt Co. v. French, 158 Mo. 539; Railway v. Stone Co., 154 S. W. 465.

*Halbert H. McClure* and *Ellison A. Neel* for respondent; *Hadley, Cooper, Neel & Wilson* of counsel.

(1) It is not disputed by plaintiff that a contract to receive a rebate or payment back of part of freight charges collected from it is unlawful under the Interstate Commerce Act, but it is contended by respondent in this case that the contract in question is no such con-

tract. (2) It is the duty of the court to leave the construction of an oral contract to the determination of the jury under appropriate instructions and where the evidence as to the intention of the parties is conflicting, it is a question for the jury. Lime Co. v. Roofing Co., 77 Mo. App. 26; Soap Works v. Sayers, 55 Mo. App. 16; Railroad v. Griffin, 126 Fed. 364; Durham v. Hastins P. Co., 67 N. Y. 632; Terra Cotta Co. v. Supply Co., 18 Fed. 332. (3) Where there is any conflict of evidence as to the intention of the parties to a contract, the court cannot declare the contract illegal as a matter of law. Railroad v. Griffin, 126 Fed. 364. (4) There is no law or statute prohibiting a railroad company from making a contract with any other corporation or party to pay a consideration in return for value received by the railroad company, even though the other party may be a shipper over the railroad, unless it be a subterfuge to pay a rebate. Lumber Co. v. Spencer, 86 Fed. 846; Rothschild v. Railroad, 15 Mo. App. 242; United States v. Milwaukee R. & T. Co., 145 Fed. 1007; Shanberg v. Railroad, 3 I. C. C. 502; Smith v. Railroad, 1 I. C. C. 611; United States v. Railroad, 152 Fed. 269; Interstate Commerce Comm. v. Railroad, 128 Fed 59; Batsell v. Railroad, 23 S. W. 552; Railroad v. Ft. Scott, 15 Kan. 435. (5) The mere fact that the freight rate was referred to in arriving at an amount to be paid by the railroad company to the lumber company for the building of the mill does not imprint the money to be paid the lumber company as a part of the freight rate money. DeWinter v. Thomas, 27 L. R. A. (N. S.) 634. (6) The contract in question was no contract with reference to railroad rates at all, but was a plain, simple contract to pay the lumber company a certain amount of money, in consideration of its locating the lumber mills adjacent to its right-of-way, which resulted in the building of a town along its right-of-way and the increasing of the business of the railroad company, and the fact that the freight upon the machinery to build the mill was referred to in arriving at the amount of money to be paid by the railroad to the lumber company, in no way invalidated said contract. Authorities as under point 4. (7) Even

under appellant's theory of this case, the contract would not be unenforcible, as the rate must be both established, filed, posted and published to be a valid rate, and it nowhere appears that the rates in question were ever filed with the Commerce Commission, or posted. U. S. Compiled Statutes, 1910, Supp. 1909, p. 1138 (Interstate Commerce Act); Armour v. United States, 153 Fed. 1; United State v. Wood, 145 Fed. 409; Railroad v. Sloop, 200 Mo. 214; Griffin v. Railroad, 115 Mo. App. 554.

WHITE, C.—The suit is for damages for breach of contract.

The plaintiff obtained judgment in the circuit court of Jackson County for the sum of $4572.54, and after an appeal to the Kansas City Court of Appeals the cause was transferred to this court on motion of the appellants on the ground that the construction of the Fourteenth Amendment to the Constitution of the United States and of section 30, article 2, of the Constitution of Missouri, was involved.

Plaintiff was a corporation engaged in the manufacture and sale of lumber, with headquarters at Houston, in the State of Texas. The petition, filed March 24, 1910, alleges that in the middle of the year 1905 the plaintiff desired to erect large mills for the manufacture of lumber at Clinesburg, in the State of Texas; that the defendants desired to have such mills erected so they "might obtain freight from the hauling of the lumber" so manufactured; the defendants in order to induce the plaintiffs to erect the mills at that time agreed with the plaintiff: "In consideration of the plaintiff erecting said mills at said place that they would pay to the plaintiff an amount equal to one-half of the defendants' proportion of all freight charges for the hauling of all the necessary machinery, material and equipment for the erection and installation of the said mills." That "in consideration of the above" the plaintiff agreed to erect and did erect said mills.

The petition then sets out in detail the machinery and material shipped from various points in other states to Clinesburg, Texas, for that purpose, over the defendants'

lines and other railroads, and the amount of freight charges paid to the defendants, one-half of which amount so received by the defendants was $4572.54. It then alleges demand of payment and refusal by defendants to pay; wherefore, plaintiff claimed damages in the sum of $4572.54.

After a general denial, the answer alleges that the contract sued on, if such there were, was illegal, void and unenforcible, and in violation of the Interstate Commerce Act.

The defendants objected to the introduction of any evidence on the ground that the petition failed to state a cause of action, demurred to the evidence at the close of plaintiff's evidence and again at the close of all the evidence; all of which objections and demurrers were overruled, and the cause was submitted to the jury.

There is little or no dispute as to the facts in the case. An agreed statement was introduced which covered all the formal requirements in making out the case as plaintiff conceived it, including the erection of lumber mills at Clinesburg; the interstate character of the shipments over the railways of the defendants of the materials and machinery that went into its construction; the amount of freight charges received by the defendants for such transportation, one-half of which was $4572.54. The stipulation then provides: "That during the entire time mentioned in the petition to this suit, said freight rates charged and paid by the plaintiff were the regular published tariff rates on said commodities, and that no new tariff, reducing the amount of the rate of said freight charges, was published during said time."

The Foster Lumber Company at the time had its headquarters at Houston, Texas, and owned large tracts of lumber lands located in San Jacinto County, Montgomery County, Harris County and Liberty County, the total amounting to over one hundred thousand acres. The plaintiff desired to erect mills at Clinesburg, which was situated on the line of defendants' railroad, in Montgomery County, within convenient distance of the several tracts. Before beginning the erection of the mills Mr.

Womack, assistant manager, and Mr. Foster, vice-president, of plaintiff, had two or three conversations with Mr. Hershey, general freight agent, and Mr. Coleman, industrial agent, representing the defendants. The plaintiff's representatives wanted to know what the defendants "could do for us in the way of concession or donation;" and put forward the advantages which the plan would be to the road. It would cost approximately five hundred thousand dollars, a town of probably fifteen hundred people would grow up at the point where it would be erected and the defendants would be furnished about a hundred and twenty-five carloads of lumber per month for transportation. Defendants' representatives then suggested that they would give, in consideration of the erection of the mills, an amount equal to half of the freight charges received by defendants on shipments of material that went into the construction of the plant. A telephone conversation finally concluded the agreement on those terms. The only difference between the testimony of plaintiff's witnesses as to what was said at these conversations and that of Mr. Hershey for the defendants, was in the use of terms, the plaintiff's representatives saying they were to receive a "donation" for erecting the mills and Mr. Hershey speaks of it as "reduced rates" for shipping the material used in erecting them. Mr. Hershey stated that his company wanted to get the mills on their roadway "to make business for our railroad," for they would "get to haul that lumber out;" also, the location of a plant of that magnitude would make something of a town and the company would profit by the freight and passenger traffic which would ensue.

After the mills were erected the defendants neglected to pay according to agreement, and the plaintiff began to write letters urging the payment. The word donation was not used in any of these letters. Such expressions as these: "refund that is due us;" " a refund of overcharge on certain shipments;" "our claim for overcharge on machinery," were used.

Mr. Hershey, it appears, desired to pay the claim and took up the matter with the home office in Chicago, but

was notified that it could not be paid, because the Hepburn amendment had become effective, making it unlawful to pay it.

The court instructed the jury that if the defendants agreed with the plaintiff "in consideration of plaintiff erecting said mills at said place" defendants would pay to plaintiff an amount equal to one-half of defendants' proportion of freight charges for handling all necessary machinery, etc., for the erection of said mills, and if plaintiff did erect said mills, etc., the jury would find for the plaintiff in the sum sued for. On behalf of the defendants the court instructed the jury if they found from the evidence that a contract or arrangement was made by the plaintiff and defendants to the effect that the plaintiff was to have "refunded or paid back to it one-half the amount the defendants collected in accordance with the tariffs and schedules filed and published as required by the Interstate Commerce Act," then plaintiff could not recover. The verdict was for the plaintiff in the amount above mentioned.

I. The liability of a carrier upon contracts concerning interstate shipments is governed entirely by the Interstate Comerce Act, and amendments thereto. The construction of that Act by the Federal courts is conclusive upon the State courts. [Donovan v. Wells Fargo, 265 Mo. 291; Haseltine v. Central National Bank, 155 Mo. l. c. 74; Barber Asphalt Pav. Co. v. French, 158 Mo. 534; American Silver Mfg. Co. v. Wabash R. R. Co., 174 Mo. App. 184; Hardwick v. Wabash R. R. Co., 181 Mo. App. 156.]

Bonus or Refund on Interstate Shipments for Increased Business.

The second section of the Interstate Commerce Act provides that it shall be unlawful "if any common carrier subject to the provisions of this act, shall, *directly or indirectly, by any special rate, rebate, draw-back or other device,* charge, demand, collect or receive from any person or persons, *a greater or less compensation* for any service rendered or to be rendered in the transportation of passengers or property subject to the provisions of

this act, than it charges, demands, collects or receives *from any other person or* persons for doing for him or them a like and contemporaneous service.''

The third section makes it unlawful: ''For any common carrier subject to the provisions of this act to make or *give any undue or unreasonable preference* or advantage to any particular person, company, firm, corporation *or locality* or *any particular description of traffic, in any respect* whatsoever, or to subject any particular *person, company, firm, corporation or locality,* or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.''

Section six of the act provides for the filing with the Interstate Commerce Commission and publishing a schedule of rates which the carrier may establish, and makes it unlawful for such carrier to charge or collect from any person a greater or a less compensation than that specified in the published schedule. This section was amended in 1903 by the Elkins Act so as to make it unlawful for any person to grant, solicit or accept ''*any rebate, concession or discrimination*'' in respect to the transportation of property, whereby such property ''shall, by any device whatever, be transported at a less rate than that named in the tariffs published.'' This section was further amended by the Hepburn Act in 1906, after the contract under consideration was entered into, making the provisions a little more specific and making it unlawful for such carrier to ''refund or remit in any manner or by any device any portion of the rates, fares and charges specified'' in the tariffs filed.

It is claimed by the appellants that the Hepburn amendment applies to the transaction under consideration the same as do the provisions of the act already in force. It is unnecessary, for the purposes of this case, to examine the reason for that position or to determine that question.

The jury by their verdict under the instruction found that the *consideration* for the agreement on which the payment was demanded was the erection of the mills at Clinesburg by plaintiff and found the contract between the parties was *not* ''to have refunded or paid back to

plaintiff'' one-half of the freight charges defendants collected. It is claimed by the respondent that here is a finding of fact by the jury which fixes the character of the contract as one that is not in contravention of the act. It was an agreement to pay a certain bonus as a consideration for the promotion of industries along the company's line, and the freight rates were simply referred to as a basis for estimating the amount of the bonus.

Putting aside for the moment the question whether the jury were not left to perform the court's function and construe the contract, about the terms of which there in no dispute, what was the effect of their finding? So far as they ascertained a fact and stated the result by the verdict it was nothing more nor less than an ascertainment of the *intention* of the parties to the contract; that is to say, they found that neither the plaintiff nor the defendants intended to violate the law; that they intended to frame their contract in such a way as to make it legal. The stated consideration for the agreement, the building of the mills, is only the surface statement of the matter. The real consideration, the inducement back of that, is made clear by the talk which led up to the arrangement. The railway companies would receive a great deal of future business in the way of handling the freight which came from the mill. If the companies, without violating the act, could give a bonus determined in amount by the freight handled in hauling materials for building the mills, with equal propriety they could give a bonus figured on the freight they would carry in hauling lumber from the mills after they were built, either for a limited time or an unlimited time; and in that case they could have provided for the payment of the bonus in installments at regular intervals based on the freight hauled up to the time of each payment. Any such arrangement would have been the same in purpose and effect as the arrangement sworn to. The consideration, measured by half the amount paid for freight hauled for certain purposes, was to get more freight to haul for other purposes, which meant an average reduction in charge for all freight hauled below the

tariffs charged the general trade. The application of confusing nomenclature and resort to an unusual method of payment do not alter the character of this concession. It would make no sort of difference in the purpose of the parties whether the bonus was paid by the railroad companies in a lump sum after the freight had been hauled and the charges paid, or whether it was simply paid by reduction of the freight bills to half charge in the first place.

It is difficult to frame a law in such form as to anticipate every clever artifice to avoid it; so, according to recognized rules of interpretation, a law of this character must be understood and enforced according to its evident purpose and in the light of conditions which brought it forth. A few cases from the United States Supreme Court show that this act has been so construed as to cover cases similar in effect and similar in shrewdly attempted evasion, to this one. The case of United States v. Union Stock Yard, 226 U. S. 286, is a case in point. There the Union Stock Yard Company, which was a common carrier engaged in interstate commerce, made a contract with the Pfaelzers whereby it agreed to pay the latter the sum of $50,000 in consideration that the Pfaelzers should build a packing plant adjacent the company's yards, costing a certain sum and having a certain capacity. The Pfaelzers agreed that all livestock slaughtered or canned by them within a certain radius should pass through such stock yards and pay the customary tolls and charges and that for fifteen years they would conduct all their slaughtering, packing and canning business at such plant. The only difference between that contract and the contract under consideration, as the latter is interpreted by respondent, is this stipulation to restrict their business to the stock yards company as a carrier for certain purposes. This however, is not a real difference, because while in the Stock Yard case the beneficiary of the bonus was obliged to deal with the Stock Yard Company for a certain time by contract, the plaintiff in the present case was compelled to do so by circumstances. It could not ship over any other road because there was no other road there. The

point decided in the Stock Yard case was that a bonus given to a favored shipper in order to procure his business, is within the inhibition of the Act. The court in that case so construed the act as it was before the Hepburn amendment, and as it stood after the Elkins amendment, which was enacted before the contract under consideration here was entered into. In the case of Fourche R. R. Co. v. Bryant Lumber Co., 230 U. S. 316, where the United States Supreme Court held that a railroad company could not purchase land by rebating to the grantor a part of the freight rate on interstate shipments, it was said, l. c. 323: "The commerce act prohibits the payment of rebates, and its command cannot be evaded by *calling them* differentials or *concessions,* nor by taking the money from the railroad itself or from a company that is proved to be the same as the railroad."

In the case of New Haven Railroad v. Interstate Com. Comm., 200 U. S. 361, l. c. 392, the carrier attempted to conceal a reduced freight rate in the selling price of a commodity which it owned, carried and sold, and the difference was accounted for in the release of an unliquidated claim for damages. The Supreme Court held that it was prohibited by the act. The court used this significant language: "How can it in reason be held that a carrier may take itself from out the statute in every case by simply electing to be a dealer and transport a commodity in that character?"

We may aptly paraphrase the question: how can the defendants in this case take themselves out of the operation of the statute by simply electing to call themselves promoters? The act was not limited in its scope to open violations and discriminations, but was intended to cover all the essential cases where free competition is abridged.

II.     But it is said there were other inducements. A town would be built there and a community would grow in commercial importance with consequent demands for freight and passenger transportation, which meant prosperity for the railroad company.

Bonus to Favored Shipper.

The promotion of such enterprises has been held to be beyond the legitimate power of a common carrier. [Union

Pacific Railway v. Goodridge, 149 U. S. 680, 1. c. 690.] Besides, the purpose of the act was not merely to compel honest competition among railroads engaged in interstate commerce, but to prevent unjust discrimination among *shippers,* to prevent one customer from obtaining in freight rates on interstate shipments an undue advantage of another customer; to promote, as far as the carriers affected the situation, free competition and equality of opportunities among the shippers engaged in maintaining industries which have need of the carrier's lines. Congress in passing the act doubtless had in mind the many instances within the common knowlege where large dealers, by reason of rebates and draw-backs and the advantages derived from them, were enabled to crush out smaller competitors who had no such advantage. The court in the Union Stock Yard case cited above (226 U. S. 1. c. 307) stated the purpose thus: "This court has had frequent occasion to comment upon the purpose of Congress in the passage of these laws to require *equal treatment of all shippers* and to prohibit *unjust discrimination* in favor of any of them."

The same court said in the case of Wight v. United States, 167 U. S. 1. c. 517: "The wrong prohibited by the section" (Section two of the Interstate Commerce Act) "is a *discrimination between shippers.* It was designed to compel every carrier to give *equal rights to all shippers* over its own road and to forbid it by any device to enforce higher charges against one than another." In the case of Int. Com. Comm. v. B. & O. R. R. Co., 225 U. S. 1. c. 342, that court thus declares the purpose of section two of the act: "It must be kept in mind that it is not the relation of one railroad to another with which we have any concern, but *the relation of a railroad to its patrons, who are entitled to equality of charges.*" In Int. Com. Comm. v. Delaware, L. & W. R. R. Co., 220 U. S. 235, that court, referring to a previous case, said: It was there held "that a carrier could not properly look beyond goods tendered to it for transportation [in carload lots] 'to the ownership of the shipment' as the basis for determining the application of its established rates."

270 Mo.—41

The public character of the service rendered by common carriers and their obligations to serve the public with indiscriminate justice has been long recognized by the courts, but, in late years, the increasing dependence of the general community upon them for the orderly dispatch of every-day affairs and the maintenance of normal conditions of prosperity, has led to a more intense realization of their purpose by the public and more emphatic pronouncement of their duties by the courts. The act under consideration is a legislative effort to furnish an instrument by which the proper exercise of their functions as public servants may be secured. According to the facts shown here, the plaintiff already had a large advantage over any other possible competitor in owning over one hundred thousand acres of land in the vicinity. By receiving reduced rates, or a bonus if the term is preferred, which would aid it in the construction of a big mill, it would necessarily have an additional advantage over any competitor, big or little, who also desired to erect a mill. It was other lumber manufacturers, actual or prospective, who were discriminated against. The small mill owner, the man of little capital, had a right to the same treatment at that point on interstate shipments as the large mill owner who obtained this advantage.

It was expected that a town would be built along the company's lines where no town had existed before. It is because of unequal opportunities in older communities that men flock to a new and growing community in order that they may have something like an equal show with the others; but a lumber manufacturer coming into this new community with that expectation, would find already that, because the common carrier, the most potent agency in the development of such new country, had granted such special advantages to a powerful competitor, an equal chance was impossible. If the company could favor a lumber dealer it could favor other dealers. It is the creation of such special privileges and such restricting of opportunities to favored persons at the start that prevent the natural and symmetrical development of such a community.

As suggested before, this was an agreement about the terms of which the parties have scarcely any dispute, but it was evident they understood it should not be reduced to writing or put in any form where it might be accessible to court orders. It is not intended by this to say that the parties were guilty of any fraud in an attempt to evade the provisions of the law, because that is not necessary. The act is not limited to fraudulent schemes and devices by which freight rates are reduced or rebates received, but covers every case where there is discrimination. [Armour Packing Co. v. United States, 209 U. S. l. c. 71.] The real purpose in concealing a discrimination is not always to evade the law, but to hide from other shippers the fact that they were being discriminated against. Doubtless it was to prevent other possible shippers from knowing that the plaintiff in this case had special favors that this was a "gentlemen's agreement" rather than a written contract.

Under the construction of the Interstate Commerce Act and its evident purpose as interpreted by the Supreme Court of the United States, a bonus to a favored shipper is a device condemned by this act. The contract here was within its provisions and void.

III. Appellant asserts there could be no rebate in this case, because, it says, there was no evidence that the rate which the respondent paid was the "legally established and published rate."

*Evidence of Established Rates.*

Section six of the act requires that every carrier subject to the provisions of the act "shall file with the Commission created by this act and print and keep open to public inspection, schedules showing all the rates," etc.

The stipulation in the agreed statement of facts before set out says that the rates charged and paid by the plaintiff were the *"regular,* published tariff rates." By signing the stipulation and offering it all in evidence plaintiff must be presumed to have offered it for a purpose for which it was competent. The evident purpose of that paragraph was to show that the law had been com-

plied with regarding establishing and posting rates and it was not competent for any other purpose; if it was not competent for that purpose plaintiff should not have offered it. Besides, plaintiff proved it paid the "regular full tariff rates," as it apparently felt it had to do in order to make out a case. The fact that the defendant charged those rates as "regular," and plaintiff paid them, is sufficient to show they were the "established" rates. In the case of Ward v. Mo. Pac. Ry. Co., 158 Mo. 226, the plaintiff sued to recover for the loss of household goods shipped. The defendant railroad company answered setting up the contract of shipment which provided that "in consideration of the rate of tariff which is less than the regular rate," the valuation of the goods should not exceed five dollars per hundred pounds, and therefore the loss was much less than plaintiff claimed. This court held that the answer set up no defense because the contract was void, that the designation of the rate as "less than the regular rate" showed it was in violation of the act.

The cases cited by respondent showing it is necessary to prove that the rate was regular, established and published, are where the contest always arose over the validity of the rate under consideration as determined by section six. This cause of action arises on account of a *discrimination* in violation of sections two and three. If the rate charged and paid was "the regular published tariff rates on said commodities," which means the same rate as the defendant charged other people, then the bonus or rebate was a reduction from that charge. If in fact defendants had violated one section of the act requiring the establishing and posting of the rates, that would not make valid a contract which was in violation of another section of the act prohibiting discrimination in rates. The principal case in this State cited by respondent, Wabash Ry. Co. v. Sloop, 200 Mo. 198, is one where the railroad company sought to recover from the shipper a deficiency in the rate paid on account of some mistake in the bill rendered, whereby the shipper had paid less than the regular rate. It was held there was no proof that the company had published the rates and hence the ship-

per was not bound by them, since he had no knowledge of them and there was nothing to give him notice. The case is not in point, for here the plaintiff seeks to recover one-half of the regular rate he has already paid according to bills presented.

The judgment is reversed. *Roy, C.*, concurs.

PER CURIAM:—The foregoing opinion by WHITE, C., is adopted as the opinion of the court. All of the judges concur.