## SOUTHWESTERN LUMBER CO. OF NEW JERSEY v. KERR.
### No. 608.

District Court, S. D. Texas,
Houston Division.

Aug. 17, 1934.

(1)

See, also (D. C.) 11 F. Supp. 252.

Terry, Cavin & Mills and Ballinger Mills, all of Galveston, Tex., and Charles H. Woods and J. C. Gibson, both of Chicago, Ill., for plaintiff.

Fulbright, Crooker & Freeman, Jno. H. Crooker, C. A. Leddy, and Charles A. Perlitz, Jr., all of Houston, Tex., for defendant.

KENNERLY, District Judge.

John H. Kirby (for brevity called Kirby) executed April 1, 1928, his two promissory notes to plaintiff for $100,000 and $3,000,000, respectively; December 20, 1929, his promissory note for $200,000; and June 6, 1930, his promissory note for $300,000, each bearing interest and each secured by pledge (under pledge agreements of even date with such notes) of certain shares (aggregating 29,667 shares) of the capital stock of the Kirby Lumber Company (for brevity called lumber company). On May 9, 1933, Kirby filed in the bankruptcy court of this district, his voluntary petition in bankruptcy, was adjudged a bankrupt, and defendant, A. E. Kerr, elected trustee.

Claiming its lien under the pledge agreements to be unaffected by the bankruptcy proceedings, the right under the wording of the pledge agreements (notwithstanding such proceedings) to sell the stock, alleging default in the payment of interest on such notes, and the advertising by it under the pledge agreements of the stock for sale on January 24, 1934, plaintiff brings (January 20, 1934) its bill to require defendant "to set up in this cause any rights he may have" and to enjoin defendant from instituting any suit or suits or proceedings before any court (other than this court) respecting the matter, and, "for such order, orders or decrees as may prevent said Defendant from interfering with, or filing a suit or suits against, Plaintiff to prevent the sale of Stock, *and* from preventing said sale on the 24th day of January, 1934, in any way."

Upon plaintiff's application (contained in the bill) for preliminary injunction, a rule to show cause was entered against defendant, returnable January 22, 1934. In answer to the rule, defendant moved to dismiss, for want of jurisdiction, and for lack of equity in plaintiff's bill, and by answer and cross-bill, set up, among other claims, that plaintiff should not be permitted to sell the stock under its pledge agreements, because (as he claimed) the indebtedness claimed by plaintiff to be secured by such stock, or a substantial portion thereof, did not exist, or, if it existed, it was tainted with usury, and/or that it was not due. Defendant also alleged that the stock was of value far greater than plaintiff's debt, that there was a substantial equity therein for the general creditors of Kirby, and prayed in his cross-bill that plaintiff be enjoined from selling the stock on January 24, 1934, as advertised. At the hearing, plaintiff's petition for preliminary injunction was denied, and defendant's petition for preliminary injunction, preventing the sale on January 24, 1934, was granted. In addition, in order to preserve the status quo of the litigation, both parties were enjoined, pending final hearing, from taking any action with respect to such stock, unless permitted by order of the court.[1] The effect of the order was to impound the stock.

March 6, 1934, plaintiff filed additional and supplemental pleadings, moving to dismiss and answering defendant's cross-bill, and praying to be allowed to again advertise and sell the stock under its pledge agreements, or that the court direct a sale thereof, for the purpose of paying off the principal and interest, etc., of its notes. Plaintiff also prays judgment for damages against defendant and a recovery on defendant's injunction bond,[2] because of delay in the sale of the stock.

In his pleadings, filed January 22, 1932,

---

[1] See order of January 23, 1934, and written opinion, filed January 23, 1934 ([D. C.] 11 F. Supp. 252), giving the reasons therefor.

[2] Plaintiff's prayer is as follows:
"Wherefore, plaintiff prays that the said cross-petition, or cross-bill, or cross-action of defendant be in all things dis-

January 23, 1934, April 9, 1934, April 19, 1934, and May 7, 1934, defendant moves to dismiss for want of jurisdiction of, and equity in, plaintiff's bill, and (without waiving his motions) answers to the merits, and files cross-action, impleading the Western Improvement Company, a corporation of Delaware (called for brevity improvement company), and the Atchison, Topeka & Santa Fé Railway Company, a Kansas corporation (called for brevity railway company). Defendant, in his answer and cross-bill, claims that such notes and such pledge contracts are *void* and *unenforceable* in a court of equity, or otherwise, in that he claims that certain options, contracts, mortgages, etc., in force, and extending over a period of more than 30 years, between railway company, plaintiff, and improvement company (or some of them) and others, upon the one hand, and Kirby and lumber company (one or both) and others, upon the other hand, are:

(a) Violative of the Elkins Act § 1 and amendments (32 Stat. 847, 34 Stat. 587, section 41, title 49, USCA).

(b) Violative of the laws of the United States against trusts and monopolies (sections 1 to 33, inclusive, title 15 USCA).

(c) Violative of the Texas Anti-Trust Laws (articles 7426 to 7447, inclusive, Texas Revised Civil Statutes 1925).

(d) Usurious under the laws of Texas, where this suit is pending, and under the laws of Illinois, where the notes are payable.

(e) Constitute a joint venture between said persons.

(f) In addition, defendant, in his cross-action, sues plaintiff, the railway company, and improvement company for $6,000,000 damages, because of an alleged conspiracy upon their part, whereby (as he claims) such 29,667 shares of stock were caused to depreciate in value, etc.

Plaintiff, improvement company and railway company, by additional or supplemental pleadings, filed May 19, 1934, in effect, move to dismiss, deny the allegations in defendant's cross-action, and join issue with defendant thereon.

The various motions were taken with, and will be disposed of by disposition of, the case.

■ 1. It is pertinent to inquire, at any time, into the court's jurisdiction. Defendant contends that this court is without jurisdiction to entertain plaintiff's suit, and that jurisdiction is exclusively in the bankruptcy court of this district. The facts pertinent to the inquiry respecting jurisdiction are *substantially as follows*:

(a) On April 1, 1928, Kirby, for the consideration, and under the circumstances, hereinafter set out (which need not be stated now, but see paragraph 2 hereof), executed two promissory notes to the order of plaintiff, one for $100,000, due ten years fixed after date, and the other for $3,000,000, due on or before ten years after date, and also executed a pledge agreement by which he pledged to secure the payment of such notes 25,500 shares of the capital stock of lumber company.

(b) On December 20, 1929, plaintiff loaned Kirby $200,000, for which Kirby executed his promissory note, due on or before April 1, 1938, and another pledge agreement by which he pledged 1,667 shares of the capital stock of lumber company to secure the payment of the $200,000 note and also of the two April 1, 1928, notes.

(c) On June 6, 1930, plaintiff loaned Kirby $300,000, for which he executed his promissory note, due on or before April 1, 1938, and also executed a pledge agreement by which he pledged 2,500 shares of lumber company's capital stock, to secure the payment of that note, and also of the three preceding notes for $100,000, $3,000,000, and $200,000, respectively.

missed and denied, and that this Court enter its decree, either

"(a) Recognizing and establishing the right and power of plaintiff to sell said stock, in accordance with the terms of said hypothecation agreements, to make the amount of principal, unpaid interest and attorneys' fees upon said notes; or

"(b) Directing a sale of the said stock for the purposes aforesaid, to be made under the orders of the Court in such manner as the Court may direct.

"Plaintiff further prays for judgment

against the defendant and the sureties on defendant's injunction bond, for all such damages as it may show that it has suffered or sustained by reason of the issuance of such injunction, the amount of which can not be stated at the time of the filing of this answer.

"And plaintiff further prays for all such other and further orders and decrees as may be proper, and as the facts may show should be entered, and for general relief, and for judgment for its costs."

(d) All of the notes bear interest from their date at the rate of 6 per cent. per annum, and contain a 5 per cent. attorney's fee clause.

(e) The notes contain substantially the same wording, a typical one, omitting signature, being as follows:

"No. 4. $300,000.00

Houston, Tex., June 6, 1930.

"On or before April 1, 1938, for value received, I promise to pay to the order of Southwestern Lumber Company of New Jersey, the sum of Three Hundred Thousand Dollars ($300,000.00), together with interest thereon from date until paid at the rate of six (6%) per cent. per annum, interest payable semiannually, and both principal and interest payable at Continental-Illinois Bank and Trust Company in Chicago, Illinois.

"As security for the payment of this note there have been delivered and pledged to the Southwestern Lumber Company of New Jersey under the terms, covenants and conditions of a certain agreement in writing between it and the maker hereof, of even date herewith certificate for two thousand five hundred shares (2,500) of the common capital stock of Kirby Lumber Company, a Texas corporation. In the event this note is not paid at maturity and is placed in the hands of an attorney for collection, I agree to pay an additional five (5%) per cent. upon the principal and interest hereof then due, as attorney's fees for collection."

(f) The pledge agreements contain substantially the same wording, that of June 6, 1930, being typical. The pertinent provisions thereof, after setting out in full the note of June 6, 1930, are as follows:

"As collateral security for the payment of said loan and said note, and as a guarantee that same will be fully paid off and discharged, together with all interest thereon, the said Kirby has delivered and pledged, and does hereby deliver and pledge with the Southwestern Company, certificate for two thousand five hundred shares (2,500) of the common capital stock of the Kirby Lumber Company, a corporation under the laws of the State of Texas, which certificate has been assigned in blank by the said Kirby at the time of the delivery thereof to the Southwestern Company, and is accompanied by powers of attorney duly executed by the said Kirby, authorizing the transfer of said stock on the books of the Kirby Lumber Company to the Southwestern Company as pledgee, or its nominee as Trustee. * * *

"Heretofore on the first day of April, 1928, the said Kirby executed and delivered to the said Southwestern Lumber Company of New Jersey two certain promissory notes, one designated No. 1 for the sum of One Hundred Thousand Dollars ($100,000.00), and the other designated note No. 2 for the sum of Three Million Dollars ($3,000,000.00), and to secure the payment of said notes delivered and pledged to the said Southwestern Company certificates for Twenty-five Thousand Five Hundred (25,500) shares of the common capital stock of Kirby Lumber Company, all of which will more fully appear from a certain agreement in writing made and entered into by and between the said Kirby and the said Southwestern Company of date the 1st day of April, 1928, to which reference is here made for particulars. And heretofore, on the 20th day of December, 1929, the said Kirby made, executed and delivered to the said Southwestern Company one certain promissory note designated note No. 3 for the sum of Two Hundred Thousand Dollars ($200,000.00) and to secure the payment of said note delivered and pledged to the said Southwestern Company certificates for One Thousand Six Hundred Sixty-seven (1,667) shares of the common capital stock of Kirby Lumber Company, all of which will more fully appear from a certain agreement in writing made and entered into by and between the said Kirby and the said Southwestern Company of date the 20th day of December, 1929, to which reference is here made for particulars. It is here now understood by and between the parties that said twenty-five thousand five hundred (25,500) shares of the common capital stock of Kirby Lumber Company delivered and pledged with the said Southwestern Company to secure the payment of said note No. 1 for One Hundred Thousand Dollars ($100,000.00), and the said note No. 2 for Three Million Dollars ($3,000,000.00), and the said One Thousand Six Hundred Sixty-seven (1,667) shares of the common capital stock of the Kirby Lumber Company delivered and pledged with the said Southwestern Company to secure the payment of the said note No. 3 for Two Hundred Thousand Dollars ($200,000.00) shall be deemed to be and are hereby delivered and pledged to the said Southwestern Company to secure as

well the payment of said note No. 4 for Three Hundred Thousand Dollars ($300,-000.00), and that the said two thousand five hundred (2,500) shares of the common capital stock of the Kirby Lumber Company delivered and pledged to the said Southwestern Company to secure the payment of said note No. 4 for Three Hundred Thousand Dollars ($300,000.00) shall be deemed to be and are hereby delivered and pledged to the said Southwestern Company to secure as well the payment of said note No. 1 for One Hundred Thousand Dollars ($100,000.00), and said note No. 2 for Three Million Dollars ($3,000,000.00), and said note No. 3 for Two Hundred Thousand Dollars ($200,000.00); *and in event of default in the payment of said notes Nos. 1, 2, 3 and 4, or either or any of them at maturity, or of any installment of interest thereon, or on either or any of them, when due, provided any such default in the payment of any installment of interest shall continue for thirty days after demand in writing for the payment thereof made by the Southwestern Company upon the said Kirby, the Southwestern Company or any legal holder of said notes or either of them, shall have the right, and authority therefor is hereby given, to sell said securities in part or as a whole, upon sixty days notice to the said Kirby, at public or private sale, or through any broker, and to become the purchaser of the whole or any part of said securities at any such sale, the proceeds of such sale to be applied first to the payment of the expenses of such sale and then to the payment of said notes, principal, interest and attorney's fees, and the surplus, if any, shall be paid to the said Kirby; but if there shall be a deficiency said Kirby shall be ' and remain liable therefor to Southwestern Company or other legal holder of said notes or either of them."*

Other provisions of the pledge agreements are the right of plaintiff to have the stock transferred to it on the stock transfer books of lumber company; the right of Kirby to vote the stock at directors' meetings of lumber company, with the requirement that he must vote it in favor of the election of two directors named by plaintiff; the application of all dividends on the stock, after deducting income tax thereon, to the notes, etc.

(g) All of the stock certificates were indorsed by Kirby, and delivered on the dates of the respective pledge agreements, to plaintiff, *and have since been in the actual physical possession and custody of plaintiff, and not in the actual nor constructive possession or custody of either Kirby or defendant, his trustee.* The stock was not transferred to plaintiff on the stock transfer books of lumber company.

(h) On May 9, 1933, Kirby filed a voluntary petition in bankruptcy in the court of bankruptcy for the Southern District of Texas, Houston Division, was adjudicated a bankrupt, and thereafter defendant was duly appointed and qualified as the trustee of his bankrupt estate.

(i) On October 20, 1933, plaintiff served on Kirby and defendant notices of default for more than 30 days after demand in the payment of certain interest installments on the four notes, and such default not having been cured, on November 21, 1933, plaintiff gave Kirby and defendant notice that it would sell at public sale the 29,667 shares of lumber company stock, described in the three pledge agreements, on January 24, 1934, at the court house door of Harris county in Houston, Tex., to make the amount of the unpaid principal and interest, etc., upon the four notes.

(j) As stated, plaintiff, by its original bill, filed January 20, 1934, its pleading filed March 6, 1934, and its pleading filed May 19, 1934, sues to require defendant to set up his claim, if any, as trustee to such stock, and restrain interference by defendant with its claimed right to sell the stock on January 24, 1934, *and/or thereafter,* as provided in the pledge agreements, and, in the alternative, that its lien be foreclosed through this court, etc. Defendant's pleadings are as stated.

(k) The value of the stock is not greater than plaintiff's debt, including interest, and there is no equity therein for Kirby's general creditors.[3]

■ The lien of plaintiff is one which existed three or more years before the filing of Kirby's petition in bankruptcy, and is, therefore, one which, under section 107 (d), title 11 USCA (section 67d, Bankrupt Act), is not affected by bankruptcy. Plaintiff (and not Kirby and not defendant, nor the bankruptcy court) being in possession of the stock, it may be sold by plaintiff under the provisions of the pledge agreements under section 93h, title 11 USCA (section 57h Bankrupt Act). Hiscock v. Bank, 206 U. S. 28, 27 S. Ct. 681, 51 L.

---

[3] See paragraph 2 hereof for a discussion of the value of the stock.

259

Ed. 945; In re Salmon Weed & Co., Inc. (C. C. A.) 53 F.(2d) 335, 79 A. L. R. 379; In re Hudson River Nav. Corp. (C. C. A.) 57 F.(2d) 175; Jerome v. McCarter, 94 U. S. 734, 24 L. Ed. 136.

■ And the lien of plaintiff being a bona fide · substantial adverse claim, and plaintiff having possession of the stock, the bankruptcy court has no jurisdiction (except by consent of plaintiff, which plaintiff has not given) of a *summary* proceeding against plaintiff to adjudicate the cause of action asserted by defendant in his cross-action herein, or any cause of action. Smith v. Mason, 81 U. S. (14 Wall.) 419, 20 L. Ed. 748; Marshall v. Knox, 83 U. S. (16 Wall.) 551, 21 L. Ed. 481; Eyster v. Gaff, 91 U. S. 521, 23 L. Ed. 403; Bardes v. Bank, 178 U. S. 524, 20 S. Ct. 1000, 44 L. Ed. 1175; Louisville Trust Co. v. Comingor, 184 U. S. 18, 22 S. Ct. 293, 46 L. Ed. 413; First Nat. Bank v. Chicago Title & Trust Co., 198 U. S. 280, 25 S. Ct. 693, 49 L. Ed. 1051; Hiscock v. Bank, supra; Galbraith v. Vallely, 256 U. S. 46, 41 S. Ct. 415, 65 L. Ed. 823.

[4, 5] Plaintiff may only be required to respond in a plenary suit. But the bankruptcy court has no jurisdiction of a plenary suit against plaintiff on the cause of action asserted by defendant here, it not being a suit under section 96, title 11 USCA (section 60 of the Bankrupt Act), section 107, title 11 USCA (section 67 of the Bankrupt Act), or section 110, title 11 US CA (section 70e of the Bankrupt Act).

■ I entertain no doubt that if the defendant trustee desired to do so, and had the funds with which to do so (and the evidence shows he does not have the funds), he could proceed under Supreme Court General Order 28 (11 USCA following section 53) to redeem. But the bankruptcy court would, in such a proceeding, acquire jurisdiction over plaintiff, and the stock only to enforce redemption, and not otherwise, and for no other purpose.

■ The foregoing discussion is upon the finding and conclusion that the bankruptcy court and defendant, its trustee, have *neither actual nor constructive possession of the stock*. If it has either, the bankruptcy court, and not this court, has jurisdiction, unless defendant, by his long delay in proceeding in the bankruptcy court, and by filing his cross-action here, has waived it. U. S. Fidelity & Guaranty Co. v. Bray, 225

U. S. 205, 32 S. Ct. 620, 56 L. Ed. 1055; Ex parte Baldwin & Thompson, 291 U. S. 610, 54 S. Ct. 551, 78 L. Ed. 1020; Isaacs v. Hobbs Tie & Timber Co., 282 U. S. 734, 51 S. Ct. 270, 75 L. Ed. 645; Straton v. New, 283 U. S. 318, 51 S. Ct. 465, 75 L. Ed. 1060; In re Henry (D. C.) 50 F.(2d) 453; State Trust & Savings Bank v. Dunn (C. C. A.) 24 F.(2d) 477; Id., 278 U. S. 582, 49 S. Ct. 184, 73 L. Ed. 518.

■ I think, however, there is no escape from the conclusion that plaintiff, and not the bankruptcy court, has possession of the stock, and that this court properly took jurisdiction of plaintiff's bill when filed, and has jurisdiction now. Taubel-Scott-Kitzmiller Co. v. Fox, 264 U. S. 426, 44 S. Ct. 396, 68 L. Ed. 770; In re Hudson River Nav. Corp., supra; In re Greenbaum & Sons (D. C.) 6 F. Supp. 245.

■ I think too that plaintiff's pleadings state a cause of action cognizable in equity, and that defendant's motion to dismiss for lack of equity is not well taken.

Defendant, however, claims that after this court, on January 23, 1934, disposed of plaintiff's application for preliminary injunction, there was nothing else before the court, and the case became moot. This position cannot be sustained. Plaintiff's original bill, on its face, seeks to require defendant to set up any rights he may have in the stock, and to restrain him from filing a suit or suits (other than in this court) to prevent the sale of the stock. *The relief asked is not limited to the sale advertised for January 24, 1934.* Besides, plaintiff, in its pleading filed March 6, 1934 (note 2), and before the filing of defendant's motions on April 9 and April 19, 1934, more fully pleaded.

■ Further, if the question of plaintiff's right to sue defendant as trustee without the permission of the bankruptcy court (as distinguished from the claim that the bankruptcy court and not this court has jurisdiction) is properly raised in defendant's pleading, then the answer (among others) is that the judge of this court, who is also judge of the bankrupt court, allowed the filing of plaintiff's bill, and entertained jurisdiction of plaintiff's suit. It will hardly be assumed that such judge did not intend, as judge of the bankrupt court, to allow the defendant, as trustee, to be sued. It will be assumed that he regarded it as to the interest of all parties to have this controversy seasonably settled.

**2.** Coming now to the *merits of plaintiff's case:* The findings of fact in paragraph 1 hereof, together with the following findings of fact, are pertinent:

(a) May 23, 1923, B. F. Bonner and J. W. Link borrowed from plaintiff $2,500,-000, executing to plaintiff their note or notes. With the money borrowed, they purchased from, and paid Kirby for, a large block of lumber company stock. The price paid Kirby was $2,500,000. To secure their note or notes to plaintiff, Bonner and Link (joined by Kirby) executed a pledge agreement to plaintiff, pledging a majority of the stock of lumber company. Kirby thereby pledged a sufficient number of shares of his remaining stock to make, with Bonner's and Link's stock, a majority of the whole number of shares of stock of lumber company.

(b) By the summer of 1923, it had been agreed between Kirby, Bonner, and Link that Kirby would reacquire from Bonner and Link the lumber company stock which he had previously sold them. In pursuance of that agreement, Kirby did reacquire such stock, assumed Bonner's and Link's indebtedness to plaintiff, and carrying out such assumption, October 1, 1923, executed his two notes to plaintiff, one for $100,000, due ten years, fixed, after its date, and the other for $2,101,305.19, due on or before ten years after its date. The aggregate of these two notes $2,201,-305.19, was the amount of principal and interest then unpaid on the Bonner and Link note or notes to plaintiff. Kirby's two notes (dated October 1, 1923) were secured by a majority of the stock of lumber company, a portion of which Kirby had thus reacquired from Bonner and Link.

(c) Prior to April 1, 1928, Kirby applied to plaintiff for an additional loan, and on that date, plaintiff loaned him an additional $938,850.03, which, together with the unpaid balance of principal and interest on his two notes of October 1, 1923, were carried into the two notes of April 1, 1928, for $100,000 and $3,000,000, respectively, which are involved in this proceeding.

(d) Afterwards Kirby applied to plaintiff for two additional loans, which loans were made to him, and note No. 3, dated December 20, 1929, for $200,000, and note No. 4 for $300,000, dated June 6, 1930, involved in this proceeding, were executed by him to plaintiff.

(e) The three pledge agreements hereinbefore set forth in paragraph 1 hereof were duly executed by Kirby to secure such notes.

(f) Neither of the notes contain acceleration clauses. All of the pledge agreements (a quotation from one of which will be found under paragraph 1 hereof) do. It is provided therein that in the event of default for a period of 30 days after demand, in the payment of the interest on such notes, the owner and holder of such notes (plaintiff) may sell the stock (wholly or in part) on 60 days' notice, at public or private sale, the proceeds of sale to be applied "first to the payment of the expenses of such sale, *and then to the payment of said notes, principal, interest and attorney's fees, and the surplus, if any, shall be paid to the said Kirby.*"

(g) That there has been default in the payment of interest on such notes, amounting, up to this time, to $600,000, is undisputed.

That plaintiff is entitled, under the law, to sell the stock, to pay the principal and interest, etc., of its debt, as it claims the right to do, I entertain no doubt. But defendant says that the value of the stock is more than plaintiff's debt (with interest), and that the general creditors of Kirby will, if the stock is sold, be deprived of the difference between its value and plaintiff's debt.

A number of witnesses testified as to the value of the stock, some reaching their conclusions from a consideration of the value of the properties of lumber company, some from the present and former value of the stock, and sales thereof on the market, some from its intrinsic value, and some in other ways, including speculation as to its value after the end of the present financial depression, and as to when the depression will end, etc. It is evident from the testimony of some of these witnesses that their information as to the properties of lumber company and their value is quite meager. This is illustrated by the testimony of some who placed such *high* or such *low* values thereon as to challenge credulity. The testimony of other conservative and well-informed witnesses, placing reasonable and conservative values on the properties of lumber company and its stock, is convincing. Considering it all, I am convinced (and so find) that the value of the 29,667 shares of stock *is not more,* and is probab-

ly much less, than the amount of plaintiff's debt, plus interest.

But if the finding be to the contrary, the evidence shows that the defendant, as trustee, has never had, nor does he now have, and there is no reasonable expectation that he ever will have, funds with which to pay the interest, and prevent a sale of the stock. This is no fault of defendant, and no fault of Kirby, and no fault of plaintiff. It is a condition of many humankind. Neither has the defendant, as trustee, any plans, either definite or indefinite, with respect to paying plaintiff its interest or principal, or with respect to the salvaging the equity which he claims in the stock, for the general creditors of Kirby. And this is no fault of defendant. There is and can be no plan because of the enormous indebtedness to plaintiff and the virtual insolvency of the Kirby estate.

It is clear, therefore, that unless defendant be right on the questions he raises as to the validity of plaintiff's notes, etc., plaintiff should be allowed to sell the stock under such safeguards as equity would impose.

3. *Discussing now defendant's defense and cross-bill* and the questions which he raises as to the validity of plaintiff's notes:

A question which defendant pressed at the trial, and which he says he does not abandon, but which he does not brief, is usury. While admitting that neither the notes of Kirby to plaintiff, nor the pledge agreements securing them, call for other than a lawful rate of interest, whether measured by the laws of Texas, where this suit is pending, or by the laws of Illinois, where the notes are payable, defendant says that under, and in dealing under, certain options, contracts, mortgages, etc., between railway company and its subsidiaries, on the one hand, and Kirby and lumber company, on the other hand, in existence over a period of more than 30 years, and in existence at the date of the notes and since, railway company and its subsidiaries, including plaintiff, received from Kirby and/or lumber company certain sums of money, which were *in fact* usurious interest on such notes.

The findings of fact in paragraph 1 and paragraph 2 hereof, together with the following findings of fact, are pertinent:

(a) Railway company owns, and has owned for many years, directly, and/or indirectly through subsidiaries, a large and extensive system of railroads. Among its carrier subsidiaries is the Gulf, Colorado & Santa Fé Railway, with extensive lines in Texas.

(b) Railway company owns, and has owned for many years, directly, and/or indirectly, numerous noncarrier subsidiaries, including plaintiff and improvement company, to which two subsidiaries (plaintiff and improvement company) it loans or advances funds to enable them to carry on the business and activities in which they are engaged.

(c) In 1901 and 1902, railway company was interested in assuring to itself a dependable tie supply, and in securing tonnage. Kirby then owned or controlled in southeast Texas large forests of timber, a few sawmills, and one or more short lines of railroad, but without adequate connection. His timber was without adequate transportation facilities, and he could not finance the construction of railroads to reach it. Railway company's lines reached the states of the Middle West, where Kirby desired to establish markets for his lumber cut from his timber, but its lines did not then reach Kirby's timber.

About that time, Kirby sold his railroad lines to railway company, or its subsidiary, resulting in railway company, or its subsidiary, so extending its lines as to have a through line from Kansas City, Mo., to Beaumont, Tex., passing through Kirby's timber holdings in Liberty, Hardin, Jefferson, and other counties in southeast Texas, and a through line from Beaumont north to a connection with the I. & G. N. Railway at Longview, passing through Kirby's timber holdings in Jefferson, Hardin, Jasper, Sabine, San Augustine, and other counties in southeast Texas. This greatly improved Kirby's transportation facilities and market, and railway company became still more interested in the matter of securing tonnage from southeast Texas.

(d) About this time (July, 1901), Kirby organized the Houston Oil Company of Texas (chartered to produce oil), and the Kirby Lumber Company (chartered to manufacture and sell lumber), transferring, or causing to be transferred, to lumber company, the sawmills, and to the oil company, most of the land and timber holdings owned or controlled by him, in southeast Texas. By a contract between lumber company and oil company, lumber company acquired the timber on oil company's lands.

(e) Since its organization, lumber company has been engaged in the manufacture of lumber and other timber products, carrying on a general lumber manufacturing business. During the entire time (except during the time Bonner and Link owned part of the Kirby stock), Kirby has owned or controlled a majority of lumber company's stock, has been its president, and largely controlled and dominated its policy and affairs.

(f) About the time of the organization of lumber company, Kirby held an option to purchase from Kountze, et al., a large body of timber land in southeast Texas, known as the "Kountze" lands. Being unable to raise the money necessary to exercise his option and thus obtain the lands, he applied to railway company for a loan to enable him to do so. An arrangement was made, by which the money was advanced by railway company through plaintiff, and such lands were conveyed by Kountze to David L. Gallup, who held the title in trust for plaintiff. Gallup executed an option agreement to Kirby, dated in July 1902, which provided that Kirby could acquire title to such lands from Gallup, by paying within five years a fixed price which would equal the amount of the purchase money of the lands which railway company had paid to Kountze, with interest and other similar carrying charges from the date of the option. This option was assigned by Kirby to lumber company. There have been, since the date (July, 1902) of this option, many, varied, and intricate changes and renewals thereof (all of which have been offered in evidence herein and are referred to for details as to amounts, rates of interest and other provisions), the ultimate result of all being that over a period of more than 30 years, lumber company has been borrowing large sums of money from railway company, paying back to railway company wholly or in part, and again borrowing, etc., on the security of the Kountze lands, but always paying the usual, customary, and a reasonable rate of interest. Throughout all these transactions, neither railway company nor its subsidiaries received from either Kirby or lumber company more, nor less, than the interest set forth in such option contracts, etc., and neither Kirby nor lumber company received from railway company or its subsidiaries more, nor less, than the money borrowed.

(g) Prior to the organization of lumber company, there was executed by the railway company and/or its subsidiaries, on the one hand, and Kirby, upon the other hand, a tie contract, whereby Kirby undertook to furnish to railway company large quantities of ties needed and used by railway company in the construction and maintenance of its railroad tracks. Later such tie contract between railway company, et al., and Kirby was abrogated, and a similar contract made between railway company, et al., and lumber company. Such tie contract was renewed from time to time so that there has been continuously in force between such parties for a period of more than 30 years, such a (or a similar) contract. (All of these have been offered in evidence and are referred to for details as to price of ties and other provisions.) Under these contracts, railway company and its subsidiaries have purchased from lumber company, over such period, a large number of ties for use, and which were used, in its railroad tracks. The price or prices paid by railway company therefor was reasonable; not more than paid by it to others under the same or similar circumstances, nor more than paid by other railway companies to other persons for their ties. Under such tie contracts, railway company and its subsidiaries paid first Kirby and afterwards lumber company for the ties purchased, the price or prices set forth in such contracts, no more and no less, and Kirby and/or lumber company delivered the ties to railway company, nothing more and nothing less.

(h) Lumber company was in the hands of receivers in this court from February, 1904, to July, 1909. When lumber company was taken from the hands of receivers in 1909, it was necessary for it to finance itself, in order to go forward with its business of manufacturing lumber. It applied to and secured a loan from railway company. To secure such loan, lumber company conveyed to J. R. Chapman, an employee of railway company (or some of its subsidiaries), a large body of land usually referred to as Chapman lands. Chapman executed back to lumber company an option, whereby lumber company was entitled to a reconveyance of such lands upon the payment of the money borrowed, plus interest and certain carrying charges in the way of taxes, expenses of policing, litigation, etc.

At the time of the execution of the Chapman option, lumber company placed a mortgage upon certain lands which were not conveyed to Chapman, together with its sawmills, tramroads, and other properties, to secure a bond issue, which bonds were purchased by railway company or some of its subsidiaries.

Since 1909, there have been many, varied, and intricate changes and renewals thereof (all of which have been offered in evidence herein and are referred to for details as to amounts, rates of interest, etc.), the ultimate result of all being that over a period of more than 30 years, lumber company has been borrowing large sums of money from railway company, paying back to railway company wholly or in part, and again borrowing, etc., on the security of its properties, but always paying the usual and customary and a reasonable rate of interest. Throughout all these transactions, neither the railway company nor its subsidiaries received from either Kirby or lumber company more, nor less, than the interest set forth in such options, mortgages, etc., and neither Kirby nor lumber company received from railway company or its subsidiaries more, nor less, than the money borrowed.

(i) Reference is made to all the various and numerous options, contracts, mortgages, and changes and extensions in evidence, for the respective amounts of money loaned, interest paid, price of ties, etc.; it being deemed unnecessary to trace the transactions in detail here.

 The notes on their face providing only for a lawful rate of interest (not exceeding a maximum of 10 per cent. in Texas and a maximum of 7 per cent. in Illinois), the burden is upon defendant to show usury by extraneous evidence. Bank of United States v. Waggener, 34 U. S. (9 Pat.) 378, 9 L. Ed. 163; Henry v. Sansom, 2 Tex. Civ. App. 150, 21 S. W. 69; Shipman v. Wright (Tex. Civ. App.) 3 S. W.(2d) 519; Armstrong v. Bank (Tex. Civ. App.) 16 S.W.(2d) 954; American Mortg. Corp. v. Dunnam (Tex. Civ. App.) 59 S.W.(2d) 1095. This, defendant has not done. Proof of the *existence* of the options, contracts, mortgages, etc., is not proof that plaintiff or railway company, or any of the subsidiaries of railway company, received sums of money thereunder, or in dealings thereunder, which were in fact, or which, under the law, would be regarded as, unlawful interest on the notes.

There is no evidence that under either the options, contracts, or mortgages, or under dealings thereunder, any sum or sums of money, or other thing of value, were received by railway company, or its subsidiaries, which could be so regarded.

Aside from this, there are a number of legal obstacles in the way of defendant sustaining his claim on this issue of usury.

I think defendant's claim of usury must fall.

 4. Another question which defendant says he does not waive, but which he does not brief, is that of joint adventure. It is discussed in the light of the facts found in previous paragraphs hereof.

Generally speaking, the courts regard a joint adventure as a kind of partnership, or certainly as having many of the elements of a partnership, yet with some elements not found in a partnership. I think it must be said that the evidence here, including the options, contracts, mortgages, etc., and all the various changes therein, not only fails to establish a joint adventure between the parties, but affirmatively shows its nonexistence.

 5. Defendant's pleadings also raise the question (and defendant neither abandons nor briefs it) of the options, contracts, etc., being in violation of the laws of the United States against trusts and monopolies (sections 1 to 33, title 15 USCA). This is considered in the light of the findings of fact in previous paragraphs hereof.

That the particular instruments, and the dealings thereunder, complained of by defendant, do not constitute interstate commerce, and that, therefore, such laws do not apply, is plain.

 6. Passing by the wording of the *entire* options, contracts, mortgages, etc., the purpose of their execution, and their meaning and effect, defendant selects from one or more of them certain paragraphs or provisions, and contends that their presence therein, etc., and the dealings of parties thereunder, are, and have been for more than 30 years, violations of certain portions (which he quotes in his brief) of the Texas Anti-Trust Laws, and that plaintiff must, therefore, be denied relief. The particular provisions of the Anti-Trust Laws to which defendant points are subdivisions (1) and (6) of article 7426, Texas Revised Civil Statutes, 1925, reading as follows:

"Art. 7426. 'Trusts.'—A 'trust' is a combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for either, any or all of the following purposes:

"1. To create, or which may tend to create, or carry out restrictions in trade or commerce or aids to commerce or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by laws of this State. * * *

"6. To regulate, fix or limit the output of any article or commodity which may be manufactured, mined, produced or sold, or the amount of insurance which may be undertaken, or the amount of work that may be done in the preparation of any product for market or transportation."

The question is considered in the light of the findings of fact in previous paragraphs hereof. The particular paragraphs of the options, contracts, mortgages, etc., of which defendant complains, are as follows:

"Section 9. That, from and after the date of this agreement, the Option Holder will not during the life of this option sell exceeding 40,000,000 feet of timber at any one time, or exceeding 100,000,000 feet of timber during any calendar year, from any properties owned or controlled by it, or mortgage any of its properties except new acquisitions, and the latter for purchase money only, without the unanimous vote of its entire board of directors, which vote, for the purpose of this condition, may be given in writing or by telegraph.

"Section 4. That at all times after the date of this agreement, and during the life of this option, all logs and timber cut from trees which the Option Holder owns or controls, or is entitled to cut, or hereafter shall own or control, or be entitled to cut, and all logs and timber which it shall cut from trees or otherwise acquire shall be sawn only in mills located at or north of Voth, and on lines constituting parts of the Santa Fe System, or on spur tracks from any of said lines, or in the existing mill owned or operated by the Option Holder and located at Village Mills, Texas, or in such other mills as may be consented to in writing by the President of the Atchison Company.

"Section 3. That neither the Option Holder nor assignee or transferee of any timber lands, timber or timber rights now belonging to the Option Holder, or which it has or may become entitled to acquire, or may in any manner control, under any existing or future contract or other arrangement made by the Option Holder, shall give or grant during the life of this option, without the consent of the President for the time being of The Atchison Company, any easement or right of way, or license, enabling any railway company, or other company, or person, except a company owning or operating some part of what at the time shall be known as The Atchison, Topeka and Santa Fe Railway System (as hereinafter defined and hereafter in this agreement termed the Santa Fe System) to construct or operate any railway track to any mill that now is located, or hereafter shall be located, on any line constituting a part of the Santa Fe System, or on any spur track from any such line, and that shall be owned, operated or controlled by the Option Holder, or by any such assignee or transferee; and that neither the Option Holder nor any such assignee or transferce shall enter into any agreement or other arrangement whereby any such railway track may be constructed to any such mill during the life of this option. For the purposes of this agreement, The Atchison, Topeka and Santa Fe Railway System (in this agreement termed the Santa Fe System) shall be deemed to include the lines owned or operated by The Atchison Company, The Gulf, Colorado & Santa Fe Railway Company, The Gulf, Beaumont & Kansas City Railway Company, The Gulf, Beaumont & Great Northern Railway Company, The Texas & Gulf Railway Company, The Jasper & Eastern Railway Company, and any company, a majority of whose capital stock now is or hereafter shall be owned or controlled by or for The Atchison Company.

"Section 5. That at all times after the date of this agreement, and during the life of this option, all lumber and other products made or manufactured at any mill or mills owned or controlled by the Option Holder, or its assigns, on lines or any line constituting part of the Santa Fe System, or on spur tracks or any spur track from any of said lines, or accessible to any of said lines, shall be shipped by and upon such lines when destined to any point on, or that can be reached via such lines, or any of them, and that the routing to such destination, when not on the Santa Fe System, shall be determined by The Gulf, Col-

orado and Santa Fe Railway Company. But this condition shall not require shipments to be so made except when the rates from such mills, or any of them, on or via the lines specified shall be as low as those made by other companies owning competing lines; provided that said Gulf, Colorado and Santa Fe Railway Company, through its General Freight Agent, shall be given notice in writing by the Option Holder of any rates offered by such competing lines, and also shall be given a reasonable opportunity to meet such rates. This condition shall not apply to the shipment of lumber supplies sold to any other railway companies (for their own use) whose lines reach the mills of the Option Holder."

Considering first the limitation on the sale by lumber company of more than 40,-000,000 feet of *timber* (trees not lumber) at any one time, or the sale during any calendar year of more than 100,000,000 feet of *timber,* and on the mortgage of any of its properties (except new acquisitions for purchase money only), without the unanimous vote of lumber company's entire board of directors, etc. Defendant says the chief vice in this provision is that the railway company and its subsidiaries had been given the right to name two members of lumber company's board of directors, and that thus railway company controlled lumber company in the respects named.

The evidence does not show that the limitation on the quantity of timber that could be sold, prevented lumber company from making sales, as and when it desired, and as its affairs seemed to require. The evidence is to the contrary. So that what is really to be considered here is the opportunity only to limit the quantity sold, and not the actual limitation. But passing that by, does the evidence show that this limitation, if such it be, creates or tends to create restrictions in trade or commerce, or in the preparation of lumber company's lumber for market, etc., or creates or carries out restrictions in the free pursuit of lumber company's business? Or does the evidence show that it regulates, fixes, or limits the output of lumber manufactured, produced, or sold by lumber company, or the amount of work done by lumber company in the manufacture of such lumber? The answer must be that it does not. There is no evidence to show whether, and how, and in what manner, the sale or nonsale of a portion of its standing timber af-

fected, or could affect, lumber company's trade and commerce, or its preparation of lumber for market, etc., or affected its free pursuit of its business. The court is asked to assume (there being no such evidence) that the failure to make sales of timber, such as defendant claims were prohibited by this paragraph, resulted as defendant claims. The results may have been exactly the contrary. So far as this record shows, it may have been greatly beneficial in preventing restrictions in trade, etc., for lumber company to have not made the prohibited sales, and to have retained its timber supply. The court is also asked to assume (there being no evidence on the issue) that the failure by lumber company to make sales, such as defendant says are prohibited by such paragraph, have regulated, and will regulate, fix, or limit lumber company's output of lumber, i. e., lumber manufactured and sold, or the amount of work done by lumber company in the manufacture of lumber. Again it must be said that the court may not assume facts in the absence of evidence. So far as it appears from this record, the failure of lumber company to make sales, such as defendant says are prohibited, may have had exactly the opposite effect upon lumber company's output and/or upon the amount of work necessary to be done in the manufacture of lumber.

The court is unwilling to assume, in the absence of evidence, that even if railway company and its subsidiaries prevented lumber company from making such sales (and the evidence is that lumber company was not so prevented), that such action had such effect upon the affairs of lumber company, and so affected the public, and the lumber market and trade and commerce, as to be a violation of this statute.

The portion of the paragraph prohibiting lumber company from mortgaging (second mortgages) its properties (except new acquisitions for purchase money) is not at all an unusual clause, and is found in most instruments of the kind under consideration. Again it must be said that there is no evidence in this record that such prohibition against a second mortgage created, or tended to create, restrictions in trade or commerce, or in the free pursuit of lumber company's business, or that it regulated, fixed, or so limited lumber company's output, as to be a violation of such statute. This is not an application of a "rule of reason" which defendant says (and I

am not sure he is correct) is not in force in Texas. It is simply a finding that the evidence in this case does not satisfy me that if all that defendant charges was done or omitted under such paragraph, was *in fact* done or omitted, there is still wholly lacking evidence of a violation of such statute.

The same observations may properly be made as to the provisions complained of by defendant, respecting the sawing of timber by lumber company, the granting of right of way to others by lumber company over its properties, and the shipment of lumber over the lines of railway company. Neither the face of the options, contracts, mortgages, etc., themselves, nor dealings of the parties thereunder, taken in connection with all the evidence in this record, affords sufficient evidence to support a finding of a violation of the Texas Anti-Trust Law as such law has uniformly been construed by Texas courts.

Aside from these conclusions, the decisions of the Texas courts present many other insurmountable difficulties in the way of defendant in his defense and attack under such law.

I think the position of defendant under the Texas Anti-Trust Law is without merit.

█ 7. It is further defendant's contention that although the record shows that over a period of more than 30 years, Kirby and lumber company have paid to railway company and its subsidiaries *full tariff rates* on all property shipped by them over the lines of railway company and its subsidiaries in interstate or foreign commerce (and in intrastate commerce); and although the record shows that such options and mortgages were purely loans to Kirby and lumber company, for which they paid the usual rates of interest, and received nothing more, and the tie contracts were only sales by Kirby and lumber company of ties to railway company and its subsidiaries, for which Kirby and lumber company received a reasonable price, and no more; that lumber company and Kirby, and railway company and its subsidiaries have, during such period, violated, and are now violating, by reason of such contracts, options, mortgages, etc., and in their dealings thereunder the Elkins Act, § 1 as amended (section 41, title 49 USCA), and that, therefore, plaintiff may not have the relief for which it prays.

This question is considered in the light of the findings of fact in previous paragraphs and the following findings:

(a) During such period of more than 30 years, lumber company was a large shipper of lumber and other similar products over the lines of railway company, and still is. Likewise, a large shipper of such products over other railway lines. The bulk of its shipments, however, being over railway company's lines. During the entire time, there is no evidence here that lumber company ever paid more or less than railway company's regular tariff rates on such shipments, or that Kirby or lumber company were ever given any other advantage in connection with such shipments, nor is there any evidence that there was any discrimination in favor of or against Kirby or lumber company in connection with such shipments, or against any other person and in their favor.

Nor is there any evidence that under such above-mentioned options, contracts, mortgages, pledges, etc. (whether they be Kirby's or lumber company's), nor under the tie contracts, either Kirby or lumber company were given any rebate, concession, advantage, nor was there discrimination against them or against others in their favor.

The facts with respect to all of such options, contracts, mortgages, pledges, etc., were and are that lumber company and/or Kirby borrowed from railway company and its subsidiaries the sums of money set forth therein, and paid the usual, customary, and reasonable rates of interest therefor, no more and no less, and created the usual liens to secure same. And the facts are with respect to the tie contract that railway company purchased from lumber company, over a period of more than 30 years, a large number of ties, paying therefor the prices named in such contracts (and no more), which were fair and reasonable and substantially the same as railway company paid others for similar ties, and substantially the same that other railway companies paid other persons for similar ties.

Stripped of irrelevant and immaterial matter, these options, contracts, mortgages, etc., stated tersely again, are:

(x) A tie contract or tie contracts, extending over a period of more than 30 years, under which railway company and/or its subsidiaries purchased, from time to time, first from Kirby, and after-

wards from lumber company, a very large number of ties, for use, and which were used, in the tracks of railway company and its various carrier subsidiaries, and for which Kirby or lumber company were paid a reasonable price, as set forth in the contracts, and no more and no less.

(xx) Certain options, whereby first Kirby, and afterwards lumber company, from time to time, over a period of more than 30 years, borrowed from railway company, or some of its subsidiaries, large sums of money (paying therefor the usual, customary, and reasonable rates of interest, no more and no less, and receiving the money borrowed, no more and no less), to be used, and which were used, by lumber company in acquiring timber, or paying for timber already acquired, or other corporate uses.

(xxx) Certain mortgages, etc., given by lumber company to railway company, or some of its subsidiaries, whereby lumber company borrowed from railway company, or its subsidiaries, for its corporate uses, large sums of money, paying therefor the usual, customary, and reasonable rates of interest, no more and no less, and receiving the money borrowed, no more and no less.

(xxxx) The notes and pledge agreements involved herein, given by Kirby to plaintiff (a subsidiary of railway company), whereby Kirby borrowed for his use the sums of money named therein, paying therefor the usual, customary, and reasonable rates of interest, no more and no less, and receiving (except in the instance where he assumed the Bonner and Link indebtedness to plaintiff) the money borrowed, no more and no less.

The wording of the particular portion of section 41,[4] which defendant says prohibits these transactions, is as follows: "And it shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said chapter whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said chapter, or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine or not less than $1,000 nor more than $20,000."

It will be seen that this statute does not, on its face, prohibit a railway carrier from purchasing its supply of ties from a shipper. To hold otherwise would be most unreasonable. Nor does the statute, on its face, prohibit a railway carrier, with a surplus of funds, from lending such funds to a shipper. And this is true whether the object of lending the money is for the purpose only of obtaining interest thereon, or whether, as here, there exists the additional purpose to create tonnage along its lines. *The particular act or acts denounced by the statute is the offering, granting, or giving by the railway carrier, or the soliciting, accepting, or receiving by the shipper, of any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce, whereby any such property shall, by any device whatever, be transported at a lesser rate than is named in the tariffs of the carrier, or whereby any other advantage is given or discrimination is practiced.*

It is necessary, therefore, to examine the tie contracts, the options, the mortgages, and the other contracts and agreements between the parties, to determine whether, under their wording and in view of their legal effect, there be a violation of this statute. It is also necessary to examine into the dealings of the parties under such contracts over a period of more than 30 years. Aided by the evidence (most of it being either documentary or from witnesses who testified orally), full argument of counsel, and ample briefs, I have done so. My conclusion, on the whole, is that such contracts, options, mortgages, etc., and the dealings of the parties thereunder, *do not constitute a violation of such statute, and do not prevent plaintiff having the relief it here seeks.* I do not think the sim-

---

[4] Section 41 (49 USCA) comes from the Elkins Act of February 10, 1903, § 1, as amended, is supplementary to the Interstate Commerce Act (49 USCA § 1 et seq.) and may well be regarded as giving teeth to the Interstate Commerce Act.

268

ple purchase by a railway company of ties from a shipper, and/or the loaning by a railway company of money to a shipper at the usual, customary, fair, and reasonable rate of interest, where there is no evidence that under and by such transactions the shipper's property is transported at less than tariff rates, and no other advantage is given the shipper, and no discrimination practiced in connection with such shipment, violates the law. And that is the case I find presented here. The cases upon which defendant stands,[5] in the main, present different states of facts to what we have here, and while there are expressions therein which seem to support defendant's view, the cases, when properly analyzed, do not do so.

My conclusion is that defendant is wrong in his contention.

■ 8. The remaining question is upon defendant's cross-action for $6,000,000 damages against plaintiff, railway company, and improvement company, for alleged conspiracy to depreciate the value of the 29,667 shares of stock involved.

(a) January 20, 1934, T. H. Mastin & Co., a common creditor of lumber company, filed in this court a bill in equity, praying the appointment of a receiver for lumber company.

(b) January 24, 1934, Western Improvement Company, holder of a second mortgage on the properties of lumber company, filed in this court another bill in equity, praying the appointment of a receiver for lumber company.

(c) Lumber company answered both bills, and the cases were consolidated, and January 25, 1934, McDonald Meachum was appointed by this court in the consolidated cause as receiver of lumber company. He qualified January 29, 1934.

(d) March 6, 1934, the Whitney National Bank of New Orleans, La., trustee of the holders of the first mortgage bonds of lumber company, filed its bill in equity in this court, praying the appointment of a receiver. Lumber company answered, and the case was consolidated with the other two cases. McDonald Meachum was appointed receiver under the Whitney Bank bill, in that his powers and jurisdiction as receiver were extended over that case and the first mortgage bonds, etc. The orders appointing the receiver invested him with title to all the properties of lumber company.

The evidence wholly fails to show a conspiracy such as is alleged, or any conspiracy. In the filing of the three bills in equity, there is no evidence of any purpose upon the part of those who filed them, or their counsel, nor upon the part of Kirby Lumber Company, or its counsel, other than the protection of whatever rights they may have in, and the preservation of, the properties of lumber company.

9. These views make it unnecessary to dispose of other questions referred to in the briefs.

It follows from what has been said that the decree must go for plaintiff. Let it be prepared in accordance with this opinion, and permitting plaintiff to sell the stock, as provided in the pledge agreements, without interference from defendant, but fixing the minimum sale price which it must bring at a sum not less than the expenses of sale, plus the amount of the principal, interest, and attorney's fees of plaintiff's notes.

[5] Interstate Commerce Commission v. Reichmann (C. C.) 145 F. 235; United States v. Union Stock Yard & Transit Co., 226 U. S. 286, 33 S. Ct. 83, 57 L. Ed. 226; Union Pacific Ry. Co. v. Goodridge, 149 U. S. 680, 13 S. Ct. 970, 37 L. Ed. 896; Kansas City Southern Ry. Co. v. C. H. Albers Commission Co., 223 U. S. 573, 32 S. Ct. 316, 56 L. Ed. 556; Foster Lumber Co. v. Atchison, T. & S. F. Ry. Co., 270 Mo. 629, 194 S. W. 281, L. R. A. 1918A, 768; Armour Packing Co. v. United States, 209 U. S. 56, 28 S. Ct. 428, 52 L. Ed. 681; United States v. Hocking Valley Ry. Co. (D. C.) 194 F. 234; Id. (C. C. A.) 210 F. 735; Id., 234 U. S. 757, 34 S. Ct. 675, 58 L. Ed. 1579; Fourche River Lumber Co. v. Bryant Lumber Co., 230 U. S. 316, 33 S. Ct. 887, 57 L. Ed. 1498; New York, New Haven & Hartford R. R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 26 S. Ct. 272, 50 L. Ed. 515; Vandalia R. R. Co. v. United States (C. C. A.) 226 F. 713; Northern Central Ry. Co. v. United States (C. C. A.) 241 F. 25; Chicago & Alton Ry. Co. v. United States (C. C. A.) 156 F. 558, 26 L. R. A. (N. S.) 551; Wight v. United States, 167 U. S. 512, 17 S. Ct. 822, 42 L. Ed. 258.