## KERR v. SOUTHWESTERN LUMBER CO. OF NEW JERSEY. *
### No. 7616.

Circuit Court of Appeals, Fifth Circuit.
May 16, 1935.

John H. Crooker and Chas. A. Perlitz, Jr., both of Houston, Tex., for appellant.

Jonathan C. Gibson and Charles H. Woods, both of Chicago, Ill., and Ballinger Mills, of Galveston, Tex., for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

FOSTER, Circuit Judge.

The Southwestern Lumber Company, a New Jersey corporation, brought an independent action in equity against A. E. Kerr, a citizen of Texas, trustee of the estate of John H. Kirby, bankrupt, who also is a citizen of Texas, to enjoin a threatened interference by the trustee with an advertised public sale of 29,667 shares of stock of the Kirby Lumber Company, pledged to secure four promissory notes, owned and held by it and aggregating, with interest, some $3,600,000. The notes were executed by Kirby individually, payable to plaintiff or order, were all due April 1, 1938, with 6 per cent. per annum interest, payable semiannually, and provided for 5 per cent. attorney's fees for collection. In response to a rule nisi, the trustee filed a return in which he moved to dismiss the bill for want of equity, and on the ground that the action should have been brought in the bankruptcy court. Further, the return alleged: That the stock pledged was of greater value than the amount of the notes, and a substantial equity existed for the benefit of the general creditors of the bankrupt estate; that, for reasons to be hereafter referred to, the notes and pledge agreements were invalid. The trustee impleaded the Atchison, Topeka & Santa Fé Railway Company and the Western Improvement Company, alleging that the latter company was a subsidiary of the Santa Fé, owning all the stock of the plaintiff corporation. By way of cross-action the trustee prayed for the cancellation of the notes and pledges and for the delivery of the stock to him as an asset of the bankrupt's estate. He also prayed for damages in the amount

*Writ of certiorari denied 56 S. Ct. 130, 80 L. Ed. ——.

of $6,000,000 on the ground that plaintiff and the parties impleaded had conspired to depreciate the value of the stock.

The District Court entered an interlocutory order impounding the stock and enjoining its sale until further orders of court. After a trial on the merits, at which the District Court heard the witnesses, the motion to dismiss was overruled and judgment was entered in favor of plaintiff, appellee herein, dissolving the interlocutory injunction, upholding the validity of the pledge, fixing the amount then due on the notes at $4,370,333.35 and enjoining the trustee from interfering with any sale of the pledged stock. From that judgment, the trustee has appealed.

There are 31 assignments of error, running to practically every conclusion of the court. It would be useless to discuss them in detail. The record is voluminous, consisting of 1,353 printed pages in all, much of which is immaterial and useless in deciding the issues presented. However, in reviewing the facts, we are greatly aided by the well-considered opinion of the District Court, found in the record.

The cause of action asserted by plaintiff is simple. As the owner and holder of certain notes secured by pledge of stock, it seeks to foreclose its lien upon that stock and to apply the proceeds to the payment of the loan. There is no doubt that plaintiff has had the exclusive possession of the stock pledged from the dates it was received, approximately three years prior to the adjudication in bankruptcy, and neither Kirby nor the trustee had either constructive or actual possession of the stock at any time thereafter. It is also certain that the money represented by the notes was actually loaned by plaintiff to Kirby and was received by him. There is no provision in the notes themselves accelerating their maturity, in default of payment of either principal or interest, but the pledge agreements provide that in the event of default of payment of principal or interest at maturity, if such default should continue for 30 days after demand in writing for payment, the holder of the notes has the right and authority to sell the securities, in part or in whole, upon 60 days' notice to Kirby, at public or private sale, or through a broker, and to become the purchaser of the whole or part of the

securities at such sale, the proceeds to be applied first to the payment of expenses of the sale, then to the payment of the notes, in principal, interest, and attorney's fees, and the surplus, if any, to be paid to Kirby; that, if there should be a deficit, Kirby should remain liable therefor to any legal holder of the notes. This constituted an agreement to mature the whole debt on default in payment of interest when due. There is no doubt that there was default in the payment of a large amount of interest, demand for payment had been made, and notice of sale had been given, all in conformity to the pledge agreement. Plaintiff had the right to foreclose its lien without reference to the bankruptcy proceedings, unless for some other reason the notes and pledges were invalid. Bankruptcy Act, § 67d (title 11 USCA § 107 (d). Hiscock v. Varick Bank, 206 U. S. 28, 27 S. Ct. 681, 51 L. Ed. 945; Hurley v. Atchison, Topeka & Santa Fé Ry. Co., 213 U. S. 126, 29 S. Ct. 466, 53 L. Ed. 729.

The trustee contends that the loans represented by the notes in suit were made for account of a joint adventure between Kirby and the Santa Fé; that they were usurious under the laws of Texas and under the laws of Illinois, where they were payable; that rebates had been given by the Santa Fé to Kirby and the Kirby Lumber Company through subterfuge in violation of the Elkins Act, § 1 and amendments, title 49 USCA § 41; and that transactions between the parties were in violation of the Federal Anti-Trust Laws, title 15 USCA §§ 1–33 and the Texas Anti-Trust Laws, articles 7426–7447, Rev. Civil Stat. Texas 1925.

The defences of joint adventure and usury as well as fraud, implied by the allegations of law violation, rest upon conclusions to be drawn from transactions between Kirby and the Santa Fé and its subsidiaries over a long period. The material facts bearing on these contentions as found by the District Court, stated somewhat briefly, are as follows:

For many years J. H. Kirby was engaged in the lumber business in Texas, owning large tracts of timber, sawmills, and several small railroads, but the outlet for his timber by rail was very much restricted. About 1901 Kirby entered into an agreement with the Santa Fé, whereby that company purchased his railroads and extended its lines through the Kirby

timber holdings and he agreed to ship his product exclusively by that railroad. About the same time the Kirby Lumber Company was organized with a capital stock of $5,000,000, represented by 50,000 shares of stock, a majority of which was owned by Kirby. This corporation took over Kirby's lumber business. The railroad entered into a contract with the lumber company to purchase railroad ties and other lumber needed for its own use. For over 30 years close and friendly relations existed between the Santa Fé, Kirby, and the lumber company. From time to time, through its subsidiaries, the railroad financed Kirby in the purchase of additional large tracts of timber and loaned him perhaps more than $12,000,000, all of which was repaid, except the outstanding notes in suit, with no more and no less than reasonable and customary interest. There were clauses in the contracts by which Kirby, or rather the lumber company, purchased timber, and in mortgages retained to secure the loans, to the effect that the amount of timber cut or sold at any one time or during any calendar year should not exceed certain designated quantities, without the unanimous consent of the board of directors, upon which the Santa Fé had two members. Kirby and the lumber company at all times paid the full tariff rates on their freight movements and received no rebates or special privilege, and the railroad paid reasonable prices for the ties and lumber purchased, the same as it paid to other parties, at the usual market prices. The restrictions in the various options and mortgages as to the cutting of timber were usually incorporated in contracts of that character and did not at all interfere with the manufacture or sale of lumber, as distinguished from timber. The business of Kirby and the lumber company was separate and distinct from that of the railroad, and there was no joint adventure between them. Based on these findings, the District Court ruled against all the contentions of the trustee as above set out.

■ It would be useless to review the many authorities cited by the parties. It may be conceded that plaintiff and the Western Improvement Company are subsidiaries of the Santa Fé. Any rebates and special privileges granted through them, although disguised as other transactions, would be violative of the Interstate Commerce Laws. If the notes and pledges in suit were devices adopted to make effective such agreements, or were given as the result of a conspiracy or contract to violate the Anti-Trust Laws, a court of equity could decline to enforce them. However, we agree with the conclusions of the District Court as to the facts. Of course, Kirby and the railroad each secured advantages by their agreements. Kirby secured an outlet for his product that theretofore he did not have, and was enabled to increase his business through the loans granted. The railroad secured additional freight tonnage not theretofore available, and reliable sources of supply, conveniently located, for the large quantities of ties necessary to be used over its extensive system. It is conceivable that the relationship thus established might have resulted in illegal rebates or restraint of trade but the facts are conclusively to the contrary.

■ The court, in his discretion, might have permitted the trustee to take over the stock pledged, upon paying off the loan, but as to this he found that the trustee was not in position to pay off the debt or even the overdue interest; that the stock was not worth more than the amount of the pledge and probably was worth less; that there was no probability that the trustee would ever be in a position to pay off the debt and redeem the stock; and that there was no probable equity in the pledged property for the benefit of the general creditors. We concur in these findings.

■ The claim for damages apparently was rested on the fact that in 1934 a receivership proceeding was instituted by an ordinary creditor of the lumber company, after which the Western Improvement Company filed another bill, as holder of a second mortgage on the property of the lumber company, and also prayed for the appointment of a receiver. The cases were consolidated, and a receiver was appointed. Shortly thereafter the Whitney National Bank of New Orleans, trustee under a first mortgage, also filed a suit for the appointment of a receiver, which was consolidated with the other two cases. It would be exceedingly far-fetched to hold that these proceedings showed a conspiracy on the part of plaintiff to depreciate the value of the stock. We find nothing else in the record that would tend to support the claim.

It follows that the judgment of the District Court was right. It is affirmed.