UNITED STATES et al. v. UNION PAC. R. CO. et al.

No. 440.

District Court, W. D. Missouri, W. D.
March 25, 1940.

918

Burt L. Smelker and Walter R. Taylor, both of Washington, D. C., and Thomas A. Costolow, of Kansas City, Mo., for plaintiffs.

Henry N. Ess and Charles Whittaker (of Watson, Ess, Groner, Barnett & Whittaker), both of Kansas City, Mo., and Robert F. Maguire, of Portland, Or., for defendant Union Pac. R. Co.

Alton H. Skinner, of Kansas City, Kan., pro se, for defendants Kansas City, Kan., and others.

John Murphy (of Harding, Murphy & Tucker), of Kansas City, Mo., for defendants Robinson and others.

Phineas Rosenberg, of Kansas City, Mo., for defendants DeOreo and another.

J. John Gillis, of Kansas City, Mo., for defendants Garrett Holmes & Co., Inc., and another.

J. C. Gibson and Roland J. Lehman, both of Chicago, Ill., and John N. Monteith (of Lathrop, Crane, Reynolds, Sawyer & Mersereau), of Kansas City, Mo., for A., T. & S. F. R. R.

Hale Houts (of Hogsett, Murray, Trippe, Depping & Houts), of Kansas City, Mo., for C., R. I. & P. R. Co.

Ilus M. Lee, Charles M. Howell, Jr., and Floyd E. Jacobs, all of Kansas City, Mo., for Kansas City, Mo.

Leonard Ulmann, of Kansas City, Mo., pro se.

Walter M. McFarland and A. C. Scott, both of Chicago, Ill., for C., B. & Q. R. R.

Leslie A. Welch, of Kansas City, Mo., for Missouri Pac. R. Co.

COLLET, District Judge.

Application for temporary injunction in proceeding instituted by the Attorney-General at the request of the Interstate Commerce Commission to restrain alleged violations of the Elkins Act, U. S.C.A. Title 49, Sec. 41 et seq.[1]

The defendants are the Union Pacific Railroad Company, hereinafter referred to as the Union Pacific, the City of Kansas City, Kansas, and its officials, hereinafter referred to as the "City," a number of wholesale produce dealers who are interstate shippers, two individual defendants characterized as promoters and the latter's attorney.

It is charged that the Union Pacific and the City and the promoters as their agents have contracted to pay to some, and are offering to pay to other interstate shippers, and the defendant produce dealers as such interstate shippers have accepted or solicited cash and other valuable considerations and concessions for locating at a new produce market constructed at Kansas City, Kansas, on the Union Pacific's Interstate railroad. The Government contends that since the payments are to produce dealers (who were engaged in that business at Kansas City, Missouri) to induce them to move to the new market at Kansas City, Kansas, and there engage in the interstate transportation of produce over the Union Pacific's lines, the payments are concessions and are "in respect to the transportation of property in interstate commerce" with the result that such property will be transported at a less rate than that named in the tariff. United States v. Union Stock Yards & Transit Co., 226 U. S. 286, 33 S. Ct. 83, 57 L.Ed. 226. The City is not a common carrier and, acting independently, has the legal right to make the payments unless forbidden by the Elkins Act. State of Kansas ex rel. Attorney-General v. City of Kansas City, Kansas, et al., 151 Kan. 1, 97 P.2d 104, Id., 151 Kan. 2, 98 P.2d 101. It is charged that the plan for the making of the payments by the City was conceived by it and the Union Pacific acting as joint adventurers and carried out in furtherance of the joint adventure for the benefit of both, and amounts to a device which produces the results prohibited by the Elkins Act. It is plaintiffs' contention that one of the objects of the payments to the Missouri dealers is to bring about the discontinuance of a produce market now located in Kansas City, Missouri.

After the institution of this action, upon the application of the Government, the four railroads which serve the Kansas City, Mo., market and the City of Kansas City, Mo., were allowed to join in the proceedings upon the ground that they possessed such an interest as to justify participation as distinguished from their legal right to maintain the action under the Elkins Act. There was evidence tending to show that the annual loss in revenue to these four railroads would total approximately $750,000 if the Missouri market was discontinued.

The City concedes that it is about to make payments amounting to approximately $140,000 to Missouri produce dealers to induce them to move to the new market but asserts that its intention was and is to make the payments independently, on its own account, for the advancement of its own market, without any agreement or understanding with the Union Pacific, and without any intention to influence the movement of interstate traffic.

The Union Pacific denies any participation in the payments.

The separate answers of the many individual defendant produce dealers in some

---

[1] "* * * it shall be unlawful * * * to offer * * * or give, or to solicit, accept, or receive any * * * concession, or discrimination in respect to the transportation of any property in interstate * * * commerce * * * whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs * * * or whereby any other advantage is given or discrimination is practiced."

instances admit "conversations", "conferences" and discussions with representatives of the Union Pacific relative to payments to be made, but assert that no payments were promised by the Union Pacific. The answer of the defendant Litman alleges the consummation of an agreement with the City for cash payments to him without knowledge of any conspiracy. He further asserts that any action of this Court which would for any cause prevent him from receiving the agreed payment from the City will deprive him of his property without due process of law. Other issues presented are collateral and incidental.

The determination of the cause will depend upon (1) whether the payments are concessions "in respect to" interstate transportation and (2) are devices resulting in concessions or discriminations to interstate shippers. Since the City contends that the market is its individual enterprise and asserts full and sole responsibility for the payments which it concedes it has offered and contracted for, no good purpose would be served in reviewing the evidence bearing upon the City's activities. The facts relative to the interest and participation of the Union Pacific in the project and the joint nature of the enterprise are as follows:

Late in December, 1936, defendants Joseph DeOreo and William Fean who had theretofore promoted the construction of wholesale fresh fruit and vegetable markets conferred with a General Agent of the Union Pacific at Cleveland, Ohio, relative to a suitable locality for another such enterprise. They were referred to another agent of the Union Pacific at Kansas City. One of the termini of the Union Pacific was at Kansas City, Kansas, where it owned a tract of land known as the Fairfax District adjoining a tract owned by the City known as the Public Levee. Both of these tracts were or could be served by the Union Pacific. It was the opinion of an executive of the Union Pacific that the Public Levee was the more suitable location. Messrs. DeOreo and Fean were shown both of these tracts as well as others by the Kansas City representatives of the Union Pacific. The Public Levee was selected as the most desirable. The Union Pacific demonstrated much interest in the establishment of the proposed market on its lines. Within a short time officials of the Union Pacific investigated the financial standing and reputation of DeOreo and Fean, formulated a tentative general plan of financing, obtained plans of other markets, considered general plans for this market, examined the pertinent statutory law of Kansas, assisted in the preparation of amendments thereto necessary to authorize the construction of this market in the manner planned, assisted in securing the introduction of a bill in the Kansas Legislature making those amendments, conferred with a prospective purchaser of bonds to be issued by the City for the construction of the market, interested the City officials in the project, introduced DeOreo and Fean to those officials, obtained estimates of costs, and architects perspective, conferred with Federal Public Works Administration attorneys relative to necessary legislation, and prepared required amendments, developed plans for the construction of yard facilities, costing approximately $300,000, analyzed freight handling by all railroads at Kansas City, Missouri, and Kansas City, Kansas, of fruits and vegetables and prepared estimates of additional revenue to be derived by the Union Pacific from the construction of the market, assisted in obtaining the passage of the necessary legislation and the signature of the bill by the Governor, and undertook to forestall anticipated opposition from Kansas City, Missouri, all within three or four months from the time the subject was first mentioned. It advanced substantially all of the promotion expenses totaling more than $20,000, including advances (or conditional loans) to DeOreo and Fean, the expense of advertising the project, inspection trips to other markets, and of numerous trips to Washington by city officials and others in connection with the City's application for a grant of public funds. It prepared or collaborated in the preparation of the application for the grant, and furnished data supporting the application, furnished much of the engineering advice and direction, selected the architects, controlled the cost of the project and type of construction, directed the activities of Mr. Fean and Mr. DeOreo, and planned and supervised the project from beginning to end. It assisted in the preparation of the form of leases, procured the execution of many leases, and dictated the rental charges, took a leading part in the negotiations culminating in the leasing of the cold storage plant, the largest single source of revenue of the produce market, and when the private interests who were expected to purchase the revenue bonds for the principal part of the financ-

ing of the project declined to purchase unless the Union Pacific guaranteed the income the Union Pacific, rather than make this guaranty, elected to purchase the bonds in order to insure the success of the project.

The advantages of the public levee site because of freedom from taxation and the benefit of governmental assistance to the City in financing were recognized by the Union Pacific at the inception of the plan. Friendly relations already existed with the City and the latter was readily interested in the project as it had a natural interest in the development of its public levee and the addition of a substantial industry. The new market as planned and later constructed is designed for handling trans-continental carload shipments of fresh fruits and vegetables. Ordinarily, shipments are not consigned to any consignee at the market. Inspection facilities are furnished and upon inspection the produce is either purchased by a wholesale dealer for local distribution or the car diverted to some other distant market. Brokers have facilities at the market and upon purchase divert carloads to designated consignees. Approximately 80% of the traffic arriving at the market is diverted. If shipments come to the market from other rail lines a charge of $6.20 per car is made by the Union Pacific on all cars going in to the market and a like charge for outgoing cars. If the car is unloaded the charge is $13.20. These charges are absorbed by the line-haul carrier. Facilities are also furnished for sale of small quantities of produce at what is referred to as "farmers stalls."

Across the river in Kansas City, Missouri, a combined wholesale and retail produce market had existed for seventy-five years or more. In many respects it was not well arranged or of modern type. The Union Pacific, DeOreo and Fean, and the City all realized early that a division of the wholesale business between the existing market and the one proposed would be fatal to the success of both. It was therefore planned by the Union Pacific and other interested parties that the produce dealers located at the Missouri market would be induced to move to the new market. Opposition to this plan was anticipated, hence the early developments of the plan were carefully clothed with the utmost secrecy possible. As the purpose of the proponents of the new market became known the anticipated opposition developed.

The campaign for the enlistment of the Missouri dealers to the new enterprise henceforward was open and intense. The efforts of the representatives of the Union Pacific and the City to meet and counteract the opposition to the plan to move the Missouri dealers to the new market were directed by the Union Pacific, were able and ingenious, but were nonetheless honorable and untainted by fraud or chicanery.

As the new market neared completion it was evident that methods more impelling than persuasion or advertisement would be necessary as the desired and necessary number of Missouri dealers had not been definitely committed to the plan to move to the new market. Other methods involving payments or concessions were not unknown to the Union Pacific. The executives of the Union Pacific were not unmindful, however, of the prohibitions of the Elkins Act. An opinion was given by the legal department of the Union Pacific shortly before the City knew of any necessity to pay dealers to move, to the effect that payments made by the City to shippers would not constitute a violation of that Act. Advice given the City Officials by an executive of the Union Pacific that the City could legally pay Missouri dealers to move to the new market may have suggested the method, later adopted, of attempting to circumvent the Elkins Act by the payments being made by the City.

But public approval and the legality of such payments by the City were doubtful. The first was sought and obtained by the assistance of a committee of prominent citizens selected by the City to consider the matter. The legality of the payments by the City was established by a test suit in the Supreme Court of Kansas expeditiously presented and at least partially directed by the Union Pacific.

After the decision of the Supreme Court of Kansas the City considered itself in a legal position to make the payments to the Missouri dealers but was without proper funds with which to make those payments. A tenant had already been secured for the cold storage unit of the market at a contracted annual rental of approximately $37,-500 per annum to commence upon completion and occupancy of the leased facilities. With the full knowledge, approval and at least some active assistance of the Union Pacific the City negotiated an agreement with that tenant to pay $80,000 cash to the City as advance rent for the specific pur-

pose of being used to make the contemplated payments to Missouri dealers.

The negotiations with the Missouri dealers relative to payments were handled in some instances by an executive of the Union Pacific, sometimes by a committee of three of which that executive was one, frequently by DeOreo during periods when he was receiving regular advancements of $300 and $350 per month, and at a two-day session of an investigating committee composed of City officials.

The Union Pacific recognized that the Elkins Act prohibited payments by it to the Missouri dealers. When negotiations by an official of the Union Pacific or the Committee of three with those parties resulted in a tentative understanding or agreement as to amounts which should be paid the dealers to move, the dealers were told that the Union Pacific could not pay them but the matter would be submitted to the City. The City made an estimate of the total amount of concessions necessary. This estimate was based upon a report of the Committee of three which was prepared and submitted by the Union Pacific member. Ordinances were passing authorizing and directing payments based on this estimate upon the execution of a contract by the dealer agreeing to move to the new market and a bond guaranteeing the performance of the contract. The payments which the City proposes to make are not to be made to all dealers at the Missouri market but only to a sufficient number of the more important or more influential to result in the discontinuance of the Missouri wholesale market. In determining the amount of the proposed payments items such as expense of moving, the settlement of unexpired leases, the value of abandoned fixtures, and in some instances good will at the old location, were considered. The testimony of several dealers with whom negotiations were conducted warrants the conclusion that the primary objective of those who conducted or took part in the negotiations was not the ascertainment of the loss or expense to the dealer of moving, but was the ascertainment of the amount necessary to be paid to bring about the move.

The interest of the Union Pacific in the success of the project is further demonstrated by the financing of the project. As indicated heretofore, the project was financed by a grant of public funds by the Public Works Administration and the issuance of revenue bonds by the City. The grant was for approximately $1,700,000, the bonds totaled $3,000,000. Of this total amount approximately $1,054,000 was for the purpose of retiring a previous issue of revenue bonds secured by all revenues from industries then or thereafter constructed on the public levee. The Federal authorities conditioned the grant of public funds upon the prior firm commitment by reliable parties to purchase the revenue bonds. A commitment was obtained from an investment banking house which was firm on its face but which contained a time limitation which the proposed purchaser secretly realized could not be met. The banking house had insisted that the Union Pacific guarantee the income or that sufficient responsible tenants be committed to accomplish that purpose. The time limit did expire releasing the bond purchaser from its commitment to buy and the proposed purchaser refused to purchase unless the Union Pacific guaranteed the income. Rather than do this or see the project fail, the Union Pacific purchased the bonds. The sole security for the principal and interest of the bonds is the revenue from the industries located on the Public Levee of which the market is by far the largest. The lien is junior to necessary operating expenses. When the question arose as to whether the City could legally use the rentals from the market, free of the lien of the bonds, for the purpose of paying the Missouri dealers to move to it, the Union Pacific advised the City such a course was proper and the former's attorney appeared before the Kansas Supreme Court in the quo warranto proceeding (State ex rel. Attorney General v. City of Kansas City, Kansas, 151 Kan. 1, 97 P.2d 104) urging the right of the City to prefer such payments to the payment of principal and interest on the bonds.

The evidence pointing toward the Union Pacific's connection with the payments by the City to the Missouri dealers, briefly summarized, is as follows: The estimated annual increase in revenues to the Union Pacific if the market is a success is in excess of $200,000 annually; the Union Pacific realized the necessity of moving the entire Missouri wholesale market to the new market; it anticipated the probable necessity of paying the Missouri dealers to move; it considered purchasing the property of one Missouri dealer's property, situated near the Missouri market having a value of approximately $75,000, in order to induce that dealer to move to the new

market; by moving the Missouri wholesale market to the new market it hoped to make easier the removal of other industries to the adjoining Fairfax district; it realized that it (the Union Pacific) could not pay tenant shippers to move to the new market without violating the Elkins Act; it assumed that tenant shippers could be paid by the City to move without violation of the Elkins Act; its attorneys formulated plans by which funds could be obtained by the City for the making of payments to the Missouri dealers; another of its officials presented and recommended one of those plans to the City officials; that plan was adopted; it assisted in carrying out that plan by assisting in negotiating the necessary contract with the tenant of the Cold Storage Plant; it assisted the City in procuring the necessary legal authority to make the payments; and after the funds were procured and the legal authority obtained by the City, the Union Pacific took a leading part in negotiations for the purpose of determining the amount of the payments to be made to the Missouri dealers. In addition to other financial interests, it was interested in the success of the market to the extent of its $3,000,000 investment in the revenue bonds and approximately $500,000 invested in rail facilities at the market.

From all of the evidence the following ultimate facts or conclusions of fact, as distinguished from conclusions of law, are established:

1. The Union Pacific and the City jointly promoted the market for the financial benefit of both.

2. When it became necessary to pay the Missouri dealers to move to the new market, together the Union Pacific and the City worked out the plan for the City to make those payments and together they set out to and are putting that plan into execution.

3. The legal department of the Union Pacific and of the City in good faith believed that the plan adopted would not result in a violation of the Interstate Commerce Commission Act, 49 U.S.C. Sec. 12, Paragraph (1), 49 U.S.C.A. § 12(1), or the Elkins Act, 49 U.S.C. Secs. 41–43, 49 U.S.C.A. §§ 41–43. The officials of the Union Pacific and the City acted upon that opinion in good faith, and with the belief they were not violating the law, adopted the plan and are attempting to execute it.

4. The nature of the business of the Missouri dealers who are to be paid to move to the new market is exclusively the transportation, purchase and sale of products almost all of which are transported in interstate commerce by rail.

5. The primary purpose of the City for making the impending payments to the Missouri dealers is to make the new market a success by the elimination of the Missouri wholesale market.

6. The primary purpose of the Union Pacific in promulgating and carrying out the adopted method of paying the Missouri dealers is likewise the success of the new market. Its interest in the success of the market is twofold. First, the additional revenue to be derived by it, and, second, the protection of its investment in the revenue bonds.

7. If the payments or concessions are made to the Missouri dealers those dealers will receive an advantage in carrying on their business of shipping products in interstate commerce by rail over other dealers at the same market and elsewhere, equal to the amount of those payments or concessions.

The proposed payments to Missouri dealers to induce them to move to the new market not being made to all tenants at the new market and being in the nature of bonuses the amount of which was not based on actual loss or expense, fall within the classification of discriminations prohibited by the Elkins Act. As stated in the syllabus of United States v. Union Stock Yards Co., 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226: "A shipper receiving a bonus from the carrier for erecting a plant on the line of the carrier has an undue advantage over a shipper not receiving any bonus or a smaller bonus." The prohibition of the law applies to any person or corporation whether carrier or not and prohibits the act which produces the forbidden result. Hence, it is not necessary that the carrier make the concessions. The city may not make concessions to shippers if the result is discrimination among shippers relative to interstate transportation.

In construing the Elkins Act in Spencer Kellogg & Sons v. United States, 2 Cir., 20 F.2d 459, loc. cit. 461, the scope of the Act was thus defined:

"Its broad and sweeping language is a clear expression of the intendment of Con-

gress to make the purposes of the act applicable to any person or corporation who might be in a position to commit an act which would accomplish the forbidden result, namely, the transportation of property at less rates than those named in the tariffs published by the carriers.

\* \* \* \* \* \*

"The purpose of the act was not to regulate carriers or shippers. Congress intended to prohibit all rebates, concessions, or discrimination with respect to railroad transportation service. This was not confined to the regulation of carriers and shippers.

\* \* \* \* \* \*

"It was not intended and does not permit any one else, other than shippers and carriers, to grant rebates or concessions. \* \* \*"

 The City stoutly maintains that so long as its primary motive is to secure tenants and not to divert traffic to the Union Pacific, the violation of the purpose of the law may not be restrained. It bases that argument upon the premise that the statutory law as construed by the highest court of the State authorizes it to obtain tenants in the manner stated. Such assertion takes no cognizance of the fact that the Constitution of the United States is controlling and by it Congress is given exclusive power to regulate interstate commerce. Under that constitutional authority Congress may and has by the Elkins Act provided that neither the City of Kansas City, Kansas, nor any other corporation or person may for any purpose make concessions which result in discrimination between interstate shippers. The language of the Act is explicit—"\* \* \* it shall be unlawful for any person, persons, or corporation to offer, grant, or give \* \* \* any \* \* \* concession, or discrimination in respect to the transportation of any property in interstate \* \* \* commerce \* \* whereby \* \* \* any other advantage is given or discrimination is practiced." Because in many of the reported cases the Elkins Act has been invoked to prevent carriers from giving concessions to shippers in order to secure their business to the disadvantage of other carriers, the City seems to assume as a fact, the fallacy that the only purpose of the Act is for the carriers' protection. When that purpose of the Act, applicable here, i. e., the prevention of discrimination among shippers is considered, it is readily apparent that the Act may be violated by one not a shipper or carrier when discrimination is produced between shippers, regardless of whether the intention is to prefer one carrier to another.

 But the discrimination must be "in respect to the transportation of (any) property in interstate commerce." Ordinarily, a landlord may with impunity and without hinderance by the Elkins Act, offer or grant any concessions it wills to persons engaged in the business of transporting property in interstate commerce to induce such person to become its tenant. It could not be suggested with reason that the City owning an office building might not (statutory authority existing) make a cash payment to one engaged in a business similar to that of the produce dealers to become its tenant. In such a case the City as the landlord makes no requirement that the tenants' business be such that the payment must necessarily and directly reduce shipping charges to be paid a common carrier. It is suggested that in no event can a payment by one not a carrier be in respect to transportation because the tenant is free to use the payment for any purpose he will and not connected in any way with tariff rates. That argument is only partially correct. In any case where the person making the payment does so under circumstances and conditions which do not require as a result that the payment directly affect the amount of tariff charges to be paid, the payment cannot be said to be in respect to transportation with resulting tariff discrimination. But where the terms of the grant or the circumstances under which it is made are such that the necessary and required result of the grant is to reduce the amount to be paid for transportation charges, the payment is in respect to transportation. In United States v. Union Stock Yards, 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226, the argument was advanced that the payment of $50,000 to a packing company to induce it to erect a packing plant adjacent to the carriers rail facilities was not based upon the transportation of property and had nothing to do with rates charged or paid. 226 U.S. loc. cit. 293, 33 S.Ct. loc. cit. 83, 57 L.Ed. 226. After determining that the grantor was a carrier and coming to the question of whether the payment was an unlawful discrimination and a fortiori in respect to transportation, attention was directed to the fact that the contract under which the payment was made required that the packing company ship over

the carrier's lines and pay the regular tariff rate. Nothing appears in the opinion as to whether the money paid was to be used for any specific purpose. It is to be assumed that there as here there was no requirement that the payment was required by contract to be used for the payment of freight rates. It was assumed there as it must be in this case that the furnishing of funds with which the shipper could pay freight charges was sufficient to bring about discrimination in favor of that shipper with respect to transportation if the shipper was required as a necessary result of accepting the payment to engage in transportation. In the Stock Yards case the contract furnished the necessary connection between the payment and transportation by requiring that the donee ship over the donor's lines. The interest of the donor in making the payment in that case may be disregarded for the purpose of determining whether sufficient connection is produced by the result to make the payment one in respect to transportation since it is the result and not the motive which determines the lawfulness of the act,[2] and fraud or bad faith need not be present.[3] It seems reasonably obvious that the underlying and real ground for holding the payment in the Stock Yards case one in respect to transportation was the requirement of the contract, since the statement following relative to the interest of the carrier was merely the statement of additional facts indicative of the direct connection between the payment and transportation which the contract requirement had already established. The Stock Yards case, not involving the identical question presented here, possibly should not be controlling authority in this case. The somewhat searching examination of that opinion has been resorted to in order to emphasize and illustrate the principle now to be applied here.

By the very nature, design and location of that part of the market and connecting facilities which the City proposes to lease to the Missouri dealers to whom payments are to be made and to other produce dealers to whom like facilities are leased but to whom payments are not made, the performance of the payment contracts by the Missouri dealers requires them to move to the new market, and, by the occupancy of the leased premises, requires the result

that they engage in interstate transportation. That part of the market to be leased to the Missouri dealers was designed for no other purpose, it can be used for no other purpose, and—referring to intent for the same purpose the Court had in doing so in the Stock Yards case—the City officials had or have no other intention in mind as to the purpose of occupancy than that the premises should be used for the sole and exclusive purpose of transporting products in interstate commerce over the lines of the Union Pacific. The applicability of the Stock Yards case should become apparent. If, in that case, the contractual requirement that acceptance of the payment necessitated transportation was sufficient, coupled with interest indicative of intent, to so connect that payment with transportation that the concession was with respect to transportation, so must the requirement resulting from the type of the facilities, that the tenants of the facilities of the market here involved engage exclusively in interstate transportation over the lines of the Union Pacific, coupled with the intention of the City that they should do so, produce the result that the payments about to be made to those tenants are in respect to transportation. There can be no difference in principle between a contractual requirement and a requirement growing out of absolute necessity. The proposed payments are so definitely intended to be in connection with interstate transportation and are by all the physical facts so necessarily connected with interstate transportation that they are in "respect to transportation." That they constitute concessions resulting in advantages to those who receive them which others will not receive is obvious. That they are prohibited by the Elkins Act is clear from the following language of the Stock Yards case, 226 U.S. loc. cit. 308, 33 S.Ct. loc. cit. 89, 57 L.Ed. 226: "The Elkins act makes it an offense for any person or corporation to give or receive any rebate, concession, or discrimination in respect to the transportation of property in interstate commerce whereby any such property shall be transported at a rate less than that named in the published tariff, or whereby any other advantage is given or discrimination is practised."

But more impelling reasons exist for granting injunctive relief than those

[2] United States v. Hocking Valley Ry. Co., D.C., 194 F. 234.

[3] Armour Packing Co. v. United States, 209 U.S. 56, 72, 73, 28 S.Ct. 428, 52 L. Ed. 681.

926

heretofore given. The evidence discloses that the new market, or Food Terminal as it has elsewhere been referred to, was conceived by the Union Pacific and DeOreo and Fean. It was promoted by them. The City joined in the enterprise for many good reasons heretofore noted. Messrs. DeOreo and Fean dropped out as proprietors of the enterprise and the project continued as the joint venture of the Union Pacific and the City. Until the time came when the necessity for the proposed payments became obvious, the Union Pacific had advanced practically all of the necessary funds[4] other than the grant of public funds and funds furnished by the City for general improvement of the Levee. When the time came for the making of the payments to the Missouri dealers, the Union Pacific, knowing it could not legally make them, said in effect to the City, its joint adventurer—"It is absolutely necessary that the Missouri dealers be moved to the Food Terminal. Here is a method by which we can pay them to move and avoid the letter of the Elkins Act. You pay them, I cannot. I will help you carry out all of the necessary details. Here is another plan by which you can get the necessary funds without cost to you. If it costs anyone anything it will be my loss and I will assist you in carrying out that plan also. Then when we get the necessary funds I will, with the assistance of two friendly prospective tenants, carry on the necessary negotiations with the Missouri dealers and you need do nothing other than formally make the payments." The evidence clearly demonstrates that this arrangement was adopted and carried out with the exception that the City officials took a more active part and performed more of the actual labor than was necessary. Whether it be characterized as a joint adventure or a conspiracy is of little moment. Certainly, it was a device within the meaning of the Elkins Act which prohibits concessions—"by any device whatever."

"A device need not be necessarily fraudulent; the term includes anything which is a plan or contrivance. Webster defines it to be 'that which is devised or formed by design; a contrivance; an invention; a project,' etc." Armour Packing Company v. United States, 209 U.S. 56, loc. cit. 71, 28 S.Ct. 428, loc. cit. 431, 52 L.Ed. 681.

One additional question requires attention. It is alleged that concessions have been made by the device of having loans made by a friendly bank without adequate security. Although the testimony discloses that many loans have been made by that bank to prospective tenants, it does not show that those loans were made at lower rates of interest than customary or that it was not the intention of the borrowers to repay the loans. Other elements of favoritism are not shown. There was evidence tending to show that one of the loans may have been somewhat inadequately secured but the testimony does not warrant the conclusion that the loan constituted a concession. It is not a violation of the Elkins Act for a bank to make ordinary loans. Neither is it a violation of that Act for the City or the Union Pacific to make such loans or to guarantee their payment so long as unlawful discrimination or actual concessions are not given.[5] Obviously, the City has the statutory authority to guarantee the repayment of loans which it has the legal authority to make. State ex rel. v. Kansas City, 151 Kan. 2, 98 P.2d 101. If these loans are not concessions and the City officials have some understanding relative to their repayment in the event the borrowers fail to do so, that the City may and should do. But those obligations, if any exist, are not proper matters for determination here. If loans constituting concessions should be made, contempt proceedings will furnish adequate recourse.

A formal judgment conforming to the conclusions expressed herein will be entered. All requests for findings and declarations not incorporated in substance in the formal findings and conclusions of the Court will be considered refused. Exceptions allowed to all adverse rulings.

---

[4] In excess of $3,500,000.

[5] Southwestern Lbr. Co. v. Kerr, D.C., 11 F.Supp. 253, Id., 5 Cir., 78 F.2d 348.